Filed 7/24/14  In re B.J. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re B.J., a Person Coming Under the Juvenile Court Law. | B252663 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>REBECCA J. et al.,<br><br>        Defendants and Appellants. | (Los Angeles County Super. Ct. No. CK95591) |

APPEAL from orders of the Superior Court of Los Angeles County, Carlos E. Vasquez, Judge.  Affirmed.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant Rebecca J.

Law Office of Robert McLaughlin and Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant Brandon J.

Office of the County Counsel, John F. Krattli, County Counsel, Jeannette Cauble, Deputy County Counsel.

Rebecca and Brandon J. appeal from jurisdiction and disposition orders in this dependency proceeding regarding their adopted son, B.J. They argue the orders are not supported by substantial evidence. We set out the facts and arguments in detail. Based on our review, we conclude the orders are supported by substantial evidence, and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

B.J. was born in December 2002 in Ethiopia. He spent several years living with his father, who represented himself to the child as an uncle. B.J. was moved to an orphanage at an unknown age, where his biological mother was able to visit him.

In November 2011, B.J. and his biological half-brother, A.J. (born in 2005), were adopted by Rebecca (mother) and Brandon J. (father), an American couple (parents). Father was in the Army reserve. They had four biological children, ranging in age from 10 to 2 years old. B.J. and A.J. had not been raised together in Ethiopia and spoke different dialects.

The family first came to the attention of the Department of Children and Family Services (the Department) in July 2012, about six months after B.J. came to the United States to live with the J.'s. Parents called the Pomona Police Department to report that B.J. had made threats to harm himself. He was hospitalized for a psychiatric hold because of suicidal ideation. During the intake process, B.J. said both he and A.J. were regularly beaten with a belt by parents. He also said he was locked in a room without food as a form of punishment and that the biological children were treated differently. He said he had been choked and scratched while attempting to run away. He told an emergency social worker that he had hit mother because she had scratched him on the face and put her hand on his throat when he tried to run away from her at a park. He said he had been given no dinners or breakfasts for four months. He said sometimes he ate at the family home, and sometimes he did not.

Hospital staff took a photograph of a scratch on B.J.'s left cheek inflicted by mother's hand, which was observed by the social worker. The social worker did not see any other marks or bruises on his face or exposed arms. B.J. said that father had hit him

2

with a belt eight or ten times. He said the biological children were not physically disciplined or denied food as punishment. He wanted to live with an Ethiopian cousin in San Diego.

In late September 2012, an emergency response referral was received because B.J. was in the hospital once more. B.J. had talked about hurting the other children. He had a history of attempting suicide by trying to jump from a window in the house. An emergency worker for the Department concluded the allegations of emotional abuse were unfounded, and that there was no evidence of a risk of other abuse or neglect.

Although both parents initially agreed to enter into a voluntary case plan with the Department, neither agreed with the wording of the plan. They contended that it placed them in an unfavorable light, contained falsehoods and exaggerations, and falsely implied that their other children were at risk because of their difficulties with B.J. Beginning in October 2012, the family received family preservation services. Both B.J. and the family were engaged in therapy with Dr. Carol Bekendam, a psychologist. Although parents thought progress was being made, B.J. vacillated between wanting to remain with them and desiring to live elsewhere.

In November 2012, B.J. was admitted again to the hospital based on his express desire to hurt himself and others. He was released after five days on a low dose of medication which calmed him and made him more easily redirected. B.J. told a children's social worker that the November hospitalization was a consequence of mother telling him to stop what he was doing in his room. B.J. said he tried to leave, but mother blocked his exit. He pushed her out of the way and started to hit her. By November 2012, both parents had taken the position that they did not need therapy services.

B.J. was hospitalized again on a psychiatric hold. He reported that father pushed his face down with his foot and twisted his arm, and that mother scratched his chest and held both his legs. The Department investigated and deemed the allegations of physical abuse unfounded since B.J. had no marks, bruises, or other indications of injury.

The family requested a meeting at the Department office in December 2012 to discuss B.J.'s behavior toward mother in the home. It was decided that B.J. would have a

3

respite visit in the home of family friends for two weeks while the rest of the family vacationed in Texas. During that respite visit, B.J. was stable without medication and had no problems with anyone in the home. He returned to parents' home in early January 2013 and was stable for a time. He told the children's services worker that mother locked him in his room at night to ensure he did not harm anyone in the house. He felt mother provoked him into getting angry.

A meeting with Pearlean White of Family Preservation Services was held in January 2013. Father attended but mother did not. The family who hosted B.J. over the 2012 holidays reported they did not have any behavior problems with him. They said he was respectful and pleasant. Father declined their offer to provide longer respite care. Confronted about why B.J. had been hospitalized several times and had been in extended respite care, father said that B.J. had been so out of control there was no other option.

B.J. was hospitalized again on February 1, 2013, apparently for saying he wanted to hurt mother. He told a children's social worker that he got angry and mother kept him separated from his biological brother and the other children. On February 8, 2013, Linda Hawes, the in-home outreach counselor, telephoned the children's social worker to report that parents had asked her if she knew of any respite homes where B.J. could be placed. That led to placement in a respite home for the weekend. When his behavior did not improve during the following week at home, he was sent back to the respite home.

In March 2013, B.J. told the children's social worker he liked the respite home but missed all his siblings, especially his brother A.J. During this visit, the social worker became aware that parents planned to have B.J. adopted by a different family. B.J. told her that he had just met the prospective adoptive parents before coming to respite care. They seemed nice and had two adopted Ethiopian girls in their home. A meeting about B.J. was scheduled for March 15, 2013, but was cancelled because parents were meeting with another family about adopting B.J.

On March 18, 2013, Ms. White wrote to the children's social worker for the Department. She suggested that B.J. be placed with the respite family as an alternative placement, looking toward transitioning back to the parents. She emphasized that

4

hospitalizations and medication of B.J. did not seem the best way to address his behavior. Father declined. The Department declined to intervene at that point because the J.'s were the legal parents of B.J. Ms. White had contacted Dr. Bekendam who said she felt that the hospitalizations were not an appropriate way to handle B.J.'s behavior. She thought a plan to discontinue his medication was necessary. Although B.J. responded well to the family with which he had spent the holidays, he had not seen them since mid-January 2013. By then, parents had found another respite family and B.J. had been with them several times in March 2013, for as much as a week at a time. Ms. White concluded the parents had opposed family preservation services from the beginning, insisting that the ongoing therapy with Dr. Bekendam was sufficient.

A meeting about B.J. was held on March 21, 2013. It was disclosed that B.J. was on a visit in northern California with a family that planned to adopt him if the visit went well. Before the Department was able to meet with counsel to discuss the legality of this proposal, B.J. was returned to parents for reasons not disclosed in the record. Father went to the airport to pick up B.J., brought him to a park, and telephoned Linda Hawes, the in-home outreach counselor. He asked her to contact the S.'s, who earlier had provided respite care for B.J., because he and mother did not want B.J. in their home. The S.'s agreed to take B.J. and suggested that he stay with them for up to six months in order to provide a stable environment. The children's social worker was informed, and scheduled a team decision meeting.

That meeting was held in April 2013. Parents agreed that B.J. would be detained. On April 12, 2013, the Department filed a petition alleging that B.J. is a dependent child under Welfare & Institutions Code section 300[1], that both parents had physically abused B.J. (counts a-1 and a-2, subdivision (a)) and had failed to protect him from such abuse (counts b-1 and b-2, subdivision (b)). It also alleged that parents were unwilling to provide parental care and supervision of B.J. due to his mental and emotional problems, and that father had requested removal of the child from the family home (count b-3,

---

[1] Statutory references are to this code unless otherwise indicated.

subdivision (b).  B.J. was placed in foster care.  Family reunification services were ordered.

In May 2013, the family (other than B.J.) moved to Texas because father was called up for active duty in the Army.  The Department's jurisdiction/disposition report summarized a telephone interview between an investigator for the Department and parents.  Father said that food was never withheld from B.J. as a form of punishment, and that food always was available.  He said mother never spanked B.J. with a belt, although she sometimes had to physically restrain B.J. to keep him from hurting himself, or to prevent him from hitting her.  Father explained that at times he was absent for service in the Army and mother was left alone to care for the children.  In his opinion, B.J. waited until father was absent to act out with mother.

Mother described B.J.'s pattern of running away.  She said she would hold B.J. around the shoulders when he got out of control, and he would kick her feet and once head butted her.  She said he got scratches on his neck in one incident when she was trying to hold him to keep him from getting away.  Food always was available, but B.J. sometimes missed meals with the rest of the family.  Mother denied spanking B.J. with a belt, but said all the children were spanked with an open hand on the bottom.  Both she and father had been spanked with a belt as children.  Mother explained:  ["]'When we do spank, it is never with a goal to cause pain, it is only used as a consequence as the last resort to shape behavior and there are never any marks or bruises left.'"  Father confirmed both parents had been spanked as children as a last resort, and that they thought this could be used as a last resort with their children.  He said they "'incorporate corporal punishment age appropriately as a loving way to correct behavior.  With [B.J.], he has been spanked with a belt may[be] 2-4 times and afterwards, there is always a talk/discussion as to what he needs to do next, that he needs to listen to, respect and obey his mom.  Afterwards, there were always hugs and kisses from parents to let him know that he's still loved despite his behavior.  When we spank our children; including [B.J.], it is never with aggression.'"

6

Both parents denied the count b-3 allegation that they were unwilling to care for B.J. They said they had started him in individual therapy in June 2012, and would have done so earlier but for the fact that he was not yet fluent in English. They had done everything they could. They had identified another adoptive family for B.J. after he became a safety risk to mother (giving her a black eye) and the other children. They agreed to place him in long term respite care while they searched for another adoptive family after the first prospective family declined to adopt. A previous respite care provider was no longer available for placement because there were nine minor children residing in the home.

The Department concluded that B.J. was having difficulty acclimating to his new culture and adoptive family. Parents said that they wanted to waive reunification services and relinquish their parental rights as to B.J. In addition, father was on active duty with the military in Texas. The Department recommended that the allegations of the petition be sustained with the amendment that mother had not spanked him, but instead locked him in a room for hours as discipline.

The Department submitted a last minute information for the jurisdiction/disposition hearing on October 30, 2013, informing the court that father now wanted the case to be transferred to Texas to begin the reunification process. Father explained that parents had believed that reunification was impossible because B.J. did not want to be in their home. But during one of father's regular telephone conversations with B.J. the week before, B.J. told him that he wanted another chance to be in parents' home. For that reason, father said that it was possible to begin the reunification process in Texas where the family now lived.

A previous foster care mother for B.J., Jenny A., testified at the jurisdiction/disposition hearing that he lived with her for several months. She had the impression he was unhappy in the home of the J.'s. He spoke well of father.

N.J., the 10-year-old biological son of parents, also testified. He said B.J. no longer lived with him because B.J. had disobeyed. He never saw anyone hit B.J. On cross-examination, N.J. said that if B.J. did something really bad, he would get spanked

7

with a belt. For less serious misbehavior, B.J. lost privileges. He said that B.J. ran away a lot, and that they would try to get him to come home for dinner. On one occasion, B.J. did not return in time for dinner, and the family ate without him.

Counsel for the Department argued that the petition should be sustained as amended. Counsel for B.J. joined in this argument. She argued the issue was not B.J.'s adjustment issues, but instead it was how the adoptive parents dealt with B.J.'s problems, and that parents needed help in dealing with his challenging behaviors. She felt that while parents appeared to be willing to care for B.J. as of the time of the hearing, they had a limited ability to deal with his special needs.

Counsel for father asked the court to dismiss the allegations regarding father's failure to protect. She argued the discipline imposed by parents on B.J. did not rise to a level supporting dependency jurisdiction, asking the court to strike the allegations that father physically abused B.J. She said that parents were now seeking to reunify with B.J., and therefore the allegation in count b-3 that parents were unwilling to care for him should be dismissed. Rather than trying to abandon B.J., she asserted, parents had placed him in respite care as a service offered when the family was under an informal supervision contract with the Department.

Counsel for mother asked the court to dismiss the entire petition. She explained that B.J. had been locked in his room for his own safety because of his pattern of running away to other houses, and that only reasonable discipline was imposed on B.J., which did not injure him. Counsel contended that by providing therapy and other efforts, parents dealt appropriately with B.J.'s issues. As to the allegation in count b-3 that parents were unwilling to care for B.J., counsel cited the last minute information for the court that stated that both parents and B.J. were now interested in reunifying.

The court struck the allegations of physical abuse in counts a-1 and a-2. It sustained count b-1 which alleged father failed to protect B.J. from physical abuse by mother, amending it to read that mother inappropriately disciplined B.J. in place of "physical abuse," and deleting the reference to the scratch on his B.J.'s cheek. The court accepted parents' explanation for locking the door to B.J.'s room and struck that

8

allegation from count b-1.  Count b-2 alleged mother failed to protect B.J. from physical abuse by father by striking the child with a belt.  The court deleted the allegation of physical abuse and changed it to inappropriate discipline in that count as well.  The court amended count b-3 to read that parents have limited ability to provide parental care and supervision for B.J.  It declared B.J. to be a dependent of the court under section 300, subdivision (b), and found by clear and convincing evidence that there was a substantial danger to B.J. if he were to be returned to parents and that removal was necessary to protect his physical and emotional health.

Counsel for B.J. recommended that the disposition be reunification services and conjoint counseling for the family, but that it would be premature to return B.J. to parents' custody and care.  The court agreed with the suggestion that conjoint counseling was required to address some of the issues to provide a better outlook for reunification before B.J. could be returned to parents.  Counsel for father agreed to conjoint counseling, which might have to be over the phone because father was in Texas.  The court ordered conjoint counseling and parenting classes as to both parents.  At mother's request, it ordered an expedited evaluation under the Interstate Compact on the Placement of Children.  The Department was ordered to investigate the possibility of transferring the case to Texas.  Parents were to have monitored visitation while in Los Angeles.

Mother and father filed timely notices of appeal from the jurisdiction and disposition orders.

## DISCUSSION

### I

Parents challenge the sufficiency of the evidence to support the sustained allegations of the amended petition.

The Department was required to prove by a preponderance of the evidence that B.J. is a dependent of the court under section 300.  (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).)  "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted

9

or uncontradicted, supports them. "In making his determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)' [Citation.]" (*Ibid.*)

Here the petition was sustained under section 300, subdivision (b), which confers dependency jurisdiction over a child when the "'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child. . . .' Thus, '[t]he three elements for jurisdiction under section 300, subdivision (b) are: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.'" [Citations.]' (*In re B.T.* (2011) 193 Cal.App.4th 685, 692.)" (*In re John M.* (2012) 212 Cal.App.4th 1117, 1124.)

Mother and father raise essentially the same arguments.[2] They contend their discipline of B.J., including spanking him with a belt, was reasonable and did not constitute a basis for jurisdiction under section 300, subdivision (b). They argue that B.J. did not suffer serious physical harm or a risk of future serious physical harm. Father cites an exception under section 300, subdivision (a), which was not alleged here, and argues that it should apply with equal force to subdivision (b) because the term "serious physical harm" appears in both subdivisions. Subdivision (a) of section 300 is a basis for jurisdiction where the child has suffered, or there is a substantial risk of harm that he or

_____

[2] Each joins in the appellate arguments raised by the other.

she will suffer, serious physical harm inflicted nonaccidentally by the parent. It contains the following exception: "For purposes of *this subdivision*, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks where there is no evidence of serious physical injury." (Italics added.) Here, the court expressly found that both parents "inappropriately disciplined" B.J. by striking him with a belt. This constitutes a finding that the spanking in this case was not reasonable and hence that the exception for reasonable spanking under section 300, subdivision (a) does not apply.

Both parents urge us to adopt the reasoning of the court in *Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72 (*Gonzalez*), which is not a dependency case. In that case, a mother was reported for child abuse after spanking her 12-year-old daughter with a wooden spoon with enough force to produce visible bruises. The local social services agency found the report substantiated and submitted it to the California Department of Justice for inclusion in the Child Abuse Central Index (CACI) under the Child Abuse and Neglect Reporting Act (CANRA), Penal Code sections 11165 through 11174.3. The mother challenged her inclusion in CACI by administrative appeal and by petition for writ of administrative mandamus.

The definitions of child abuse in CANRA were found to "have been borrowed almost verbatim from the statutes defining two forms of *criminal* child abuse." (*Gonzalez*, *supra*, 223 Cal.App.4th at p. 86, citing Pen. Code, §§ 273a and 273d.) The court cited criminal cases recognizing a parent's right to reasonably discipline his or her children without being subjected to criminal liability, and observed that a similar rule in tort cases had been abolished in California. (*Ibid.*) In a footnote, the *Gonzalez* court noted the spanking exception codified in section 300, subdivision (a).[3] But its recognition of a parental privilege for reasonable discipline was based on its conclusion

---

[3] The footnote reads: "In a somewhat similar vein, the dependent child law provides that in the absence of 'serious physical injury,' the 'serious physical harm' that will warrant the assertion of juvenile court jurisdiction 'does not include reasonable and age-appropriate spanking to the buttocks.' (Welf. & Inst. Code, § 300, subd. (a).)" (*Gonzalez*, *supra*, 223 Cal.App.4th at p. 86, fn. 11.)

11

that CANRA "was aimed at criminal conduct" and that a disciplinary privilege had long been applied in criminal cases.[4] (*Id*. at p. 88–89.) The court noted that the Legislature made CANRA a part of the Penal Code rather than the Welfare and Institutions Code or other codes. (*Ibid.*) The *Gonzalez* court confined its analysis to whether there was a parental discipline privilege that applied under CANRA and did not discuss application to cases brought under section 300. "'"'It is axiomatic that cases are not authority for propositions not considered."'' [Citation.]" (*McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 626.)

We need not resolve whether the parental discipline privilege recognized in *Gonzalez*, *supra*, 223 Cal.App.4th 72, applies in dependency proceedings because we find substantial evidence to support jurisdiction on the alternative ground that parents had a limited ability to provide parental care and supervision for B.J. The record establishes that between the ages of 10 and 11, B.J. was subjected to repeated psychiatric hospitalizations and medication because parents had been unable to cope with his behavior through counseling and other measures. B.J. repeatedly expressed a desire to harm himself, mother, or others. He ran away frequently. He had been placed in respite care on several occasions, and parents actively sought an alternative adoptive home for him. They informed the Department of their wish to waive reunification services and relinquish their parental rights as to B.J. B.J. did not want to live with the family, although he seemed to have formed a positive relationship with father.

It was only on the day before the jurisdiction hearing that father notified the Department that B.J. had changed his mind and wanted a chance to reunify with the

_____

[4] The *Gonzalez* court also concluded that evidence the child was bruised by the spanking did not require a finding that the limits of reasonable discipline under the privilege were exceeded. It found no evidence that the mother intended to inflict bruises. It followed that the bruises could have been accidental within the meaning of a CANRA provision which makes a report of child abuse unfounded if it involves an accidental injury. (*Gonzalez*, *supra*, 223 Cal.App.4th at pp. 93–94.)

12

family.  Parents had agreed, and were willing to attempt reunification by transferring the matter to Texas where they lived.

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.'  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)"  (*In re D.P.* (2014) 225 Cal.App.4th 898, 902.)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction.  [Section 300, subdivision (b)] require[s] only a 'substantial risk' that the child will be abused or neglected.  The legislatively declared purpose of [section 300] 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.'  (§ 300.2, italics added.)  'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'  [Citation.]"  (*In re I.J.*[*supra*,] 56 Cal.4th [at p.] 773.)  "[T]he court may . . . consider past events when determining whether a child presently needs the juvenile court's protection. . . .  A parent's past conduct is a good predictor of future behavior.  [Citation.]  'Facts supporting allegations that a child is one described by section 300 are cumulative.'  [Citation.]  Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.'  [Citation.]"  (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

Parents argue that jurisdiction under count b-3 of the petition is not supported because there is no evidence they caused B.J.'s emotional issues which, they argued, were due to his problems in adapting to a new family and new culture while grieving for the loss of contact with his biological parents in Ethiopia.  In addition, father argues that at the time of the jurisdiction hearing, parents had changed their minds and were willing to reunify with B.J. so no risk of future harm existed.

13

We address the last point first. The change of heart expressed by parents regarding reunification with B.J. on the day before the hearing does not negate any risk of future harm to B.J. if he were to be returned to parents' custody without dependency court supervision. Parents did not demonstrate a plan at the hearing for future care of B.J. that would alleviate the serious problems he experienced while in their care. In short, as the juvenile court determined, under the circumstances presented here, it would be unwise to immediately return B.J. to parents without a transition period to determine whether the problems that led to the petition could successfully be addressed.

The jurisdiction allegations under section 300, subdivision (b) were based in part on acts or omissions by parents which caused B.J.'s emotional problems and exposed him to risk of serious physical harm in light of his threats to harm himself and attempts to throw himself from a window of the house. Their efforts to handle B.J. contributed to his issues. His psychologist, Dr. Bekendam, opined that hospitalizations and medication of B.J. were not the best way to address his behavior. She felt a plan to discontinue his medication was necessary. Dr. Bekendam emphasized that B.J. needed stability, security, enormous patience, reassurance, and a "nonpunitive structure." She supported any continuity which could be provided. As of the time of the jurisdiction hearing, parents had not provided the stable environment B.J.'s therapist recommended since they had resorted to repeated psychiatric hospitalizations, respite care, and eventually a search for an alternative adoptive family. They disciplined him by spanking him with a belt. Despite their efforts, they had not been able to resolve B.J.'s behavior which put him at risk of future harm.

Both parents cite *In re V.M.* (2010) 191 Cal.App.4th 245 (*V.M.*) for the proposition that there is no basis for jurisdiction under section 300, subdivision (b) because there is no evidence they did or failed to do anything that constituted child abuse. The case is distinguishable. V.M. was born in 2002 but had lived with her maternal grandparents all her life. She had occasional visits with father. When the child was seven, a custody dispute arose between father and the maternal grandparents. The grandparents reported father to the Department for abusing alcohol while with the child,

14

and for neglect. (*Id*. at p. 249.) At the jurisdictional hearing, the court struck all the allegations of alcohol abuse and that father had placed the child at risk of harm, for lack of evidence. Instead, it sustained its own allegation that the child would be traumatized by being removed from her grandmother and placed with a father who had neglected his parental duties. (*Id*. at p. 251.) The appellate court found no evidence that the father did or failed to do anything which caused the child serious physical harm or illness or put her at risk of such harm. (*Id*. at p. 253.)

Father also relies on *In re Precious D.* (2010) 189 Cal.App.4th 1251, in which the juvenile court asserted dependency jurisdiction over an incorrigible 17-year-old teenager. The court in that case held that "parental unfitness or neglectful conduct must be shown in order to assert dependency court jurisdiction under that part of section 300(b) providing for jurisdiction based on the parent's 'inability . . . to adequately supervise or protect the child.'" (*Id*. at p. 1254.) The minor ran away from home and from foster homes, missed school, and persisted in claims of abuse not supported by medical examinations. After some time in foster care she was hospitalized for wanting to hurt herself. After her release, she was suspended from school. The Department filed a petition seeking dependency jurisdiction under section 300(b) for failure to protect. (*Id*. at p. 1256.) The appellate court found insufficient evidence of unfitness or neglectful conduct by the mother and reversed. (*Id*. at pp. 1259–1261.)

Both parents rely on *In re Nicholas B.* (2001) 88 Cal.App.4th 1126 (*Nicholas B.*). In that case, Nicholas had been adopted at age six. When he was nine, he began therapy because of serious behavior problems including attempting to start a fire at school, stealing things, and hoarding food, in addition to other disciplinary problems at school. He suffered uncontrollable rages. The parents sought additional assistance from another therapist for the child and parent support groups. When Nicholas was 13 years old, his mother struck him in the face after a dispute about spilled food, sibling squabbles, and his use of offensive language. When Nicholas's therapist saw facial bruising and swelling the next day, he reported the incident to the appropriate child protection agency. Father admitted he too had hit the child in the past. (*Id*. at p. 1130.)

15

The parents agreed to place Nicholas in foster care. He was diagnosed with having reactive attachment and posttraumatic stress disorders. (*Nicholas B.*, *supra*, 88 Cal.App.4th at pp. 1130–1131.) After six months of voluntary services, the agency filed a petition pursuant to section 300, subdivision (b) (failure to protect) alleging that parents were not able to alleviate the concerns that brought Nicholas to its attention and were not prepared to reunify with him. (*Id*. at p. 1131.) After a contested jurisdiction hearing, the juvenile court found Nicholas to be a child as described by section 300, subdivision (b). (*Id*. at pp. 1131–1132.)

The Court of Appeal treated the parents' appeal as a demurrer to the dependency petition rather than a challenge to the evidence supporting jurisdiction, a significant procedural distinction from our case. (*Nicholas B.*, *supra*, 88 Cal.App.4th at pp. 1132–1133.) The petition alleged the one incident in which mother struck Nicholas, but with no allegations suggesting serious physical harm would be inflicted again. Father was not mentioned in the petition's factual allegations, although there had been extensive testimony as to his abusive personality and physical acts against Nicholas. (*Id*. at pp. 1134–1135.) The *Nicholas B.* court found it most significant that none of the allegations of the petition focused on the parents' conduct as the cause of the child's serious emotional problems. (*Id*. at p. 1136.) The court found that a basis for jurisdiction under section 300, subdivision (b) had not been alleged. (*Id*. at p. 1137.)

In contrast, although they apparently acted with good intentions, parents subjected B.J. to repeated hospitalizations and medication found inappropriate by his therapist. Although Dr. Bekendam recommended a nonpunitive environment, B.J. was spanked with a belt. Parents resisted and did not cooperate with family preservation services offered to them, insisting that therapy with Dr. Bekendam was sufficient. In addition, contrary to the therapist's recommendation that B.J. receive stability, parents placed him in respite care and informed him that they were seeking an alternative adoptive family for him. The evidence supported the juvenile court's conclusion that jurisdiction under section 300, subdivision (b) was warranted.

16

## II

Mother challenges the court's disposition order because, she claims, the evidence does not satisfy the higher evidentiary standard requiring clear and convincing evidence to justify removing B.J. from her home. She contends the juvenile court failed to consider all less drastic alternatives to removal as required, citing *In re Hailey T.* (2012) 212 Cal.App.4th 139, 148–149; *In re Henry V.* (2004) 119 Cal.App.4th 522, 529; and *In re Jeannette S.* (1979) 94 Cal.App.3d 52, 60.)

Father argues that the disposition order was not supported by substantial evidence because B.J. was not exposed to any substantial danger to his physical health, safety or well-being while in parents' care, in light of their history of cooperation with the Department and active involvement in family maintenance and preservation services. He also contends that the higher standard of clear and convincing evidence at disposition was not satisfied.

The Department argues that parents waived their challenge to the disposition order because they did not ask the court to place B.J. with them at the hearing. It cites *In re A.A.* (2012) 203 Cal.App.4th 597 in support of this argument. But that case involved the failure of a noncustodial parent to request custody. (See *In re Isabella F.* (2014) 226 Cal.App.4th 128, 134 [request for contested jurisdiction/dispositional hearing preserved challenge to sufficiency of the evidence]; *In re Erik P.* (2002) 104 Cal.App.4th 395, 399–400 [contention that judgment is not supported by substantial evidence is exception to rule that objection must be raised in trial court].)

A disposition order removing a child from parental custody is reviewed for substantial evidence. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) "Under section 361, subdivision (c)(1), a dependent child may not be taken from the physical custody of the parents with whom the child resides at the time the petition was initiated unless the juvenile court finds by clear and convincing evidence '[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor

17

from the minor's parent's . . . physical custody.' (§ 361, subd. (c)(1).)  'The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home.  (§ 361, subd. (c)(1).)'  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)  '"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child."  [Citation.]  The court may consider a parent's past conduct as well as present circumstances.  [Citation.]'  [Citation.]"  (*Ibid.*)

We find substantial evidence to support the disposition order under the heightened clear and convincing evidence standard for the reasons we discussed above.  Placement with parents presented a substantial risk of harm to B.J.'s physical health, safety, or physical or emotional well-being.  At the hearing, parents indicated a willingness to cooperate with reunification services, but did not suggest that they had a plan in place which would avoid the circumstances which put B.J. at risk before.  Other than the family's move to Texas, and B.J.'s improved behavior in foster care, there was no evidence of how parents planned to address his needs if he was returned to them.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


WILLHITE, J.                                EDMON, J.*

_____

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.