[No. B220976. Second Dist., Div. Eight. Dec. 22, 2010.]

In re V.M., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
V.M., Defendant and Appellant.

**COUNSEL**

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

Children's Law Center of Los Angeles and Joseph Robert Barrell for Minor.

OPINION

GRIMES, J.—

## INTRODUCTION

The trial court was not justified in asserting dependency jurisdiction over the child in this case, who had never been abused or neglected by *anyone*. The child, V.M., came to the attention of the Los Angeles County Department of Children and Family Services (the Department) after her father asserted his right to custody of his daughter, seeking to gradually remove the child from the only home she had ever known where she lived with her maternal grandparents after her mother's death.

V.M. was seven years old when she twisted her ankle at school and stayed home for a week. Her father, wondering why his daughter was not in school (her grandparents having told him nothing about the injury), went to her school to inquire. The principal had known the family for years and recognized him as V.M.'s father (father). The principal told father how his daughter sprained her ankle and encouraged him to visit V.M., who was back in school. After that, father went to the grandparents' home to make arrangements to take custody of her; the grandparents did not cooperate; father called for police assistance; and soon thereafter, the grandparents hired a lawyer to file a probate case to have themselves declared V.M.'s legal guardians. They also made a report of child abuse to the Department.

Maternal relatives reported father abused alcohol regularly and always during his rare visits with his daughter. They reported father saw V.M. no more than twice a year, and he ignored his daughter to drink himself into oblivion with his second wife and friends. They reported that during a recent visit, father got drunk, left his daughter locked in his truck for half an hour to drink some more and then, when his adult son discovered the child locked and sobbing in his truck, drove her home in an intoxicated state. Needless to say, this report prompted the full intervention of the Department, with interviews and evaluations by social workers, doctors, and psychologists, referrals for further evaluations, drug and alcohol testing, and extensive interviews of family, friends, neighbors, school officials, and others.

In the end, however, after a contested jurisdictional hearing, the dependency court struck all the allegations of alcohol abuse, including the allegation that father had left V.M. locked and alone in his truck. That left no

allegations by the Department to support jurisdiction over the child, who clearly did not want to leave her grandparents to go live with a father she felt she barely knew. So the dependency court amended the allegations on its own motion based on the finding that father had "abdicated his role of father for his daughter all her life."

In short, the ruling resulted in the child being suitably placed with her grandparents, and put a father who had never harmed his child at risk of losing parental rights if he did not fulfill all court orders recommended by the Department. The court's assertion of dependency jurisdiction in this case was an abuse of discretion, and we reverse. We express no view as to whether probate proceedings may be appropriate to determine whether the grandparents should be declared the child's guardians. We simply hold the dependency court cannot assert jurisdiction where there is no evidence of parental abuse or neglect.

## BACKGROUND

Father married V.M.'s mother in 1997. They separated in 2002, shortly after V.M. was born. V.M. has lived with her maternal grandparents all her life. V.M.'s mother died in 2006, and father remarried shortly thereafter. Father's wife (stepmother) testified that she had lived with father seven years and been married to him for three years at the time of the jurisdictional hearing. She has children ages nine and 18 who live with her and father. She is a job instructor for the developmentally disabled, teaching skills for independent living. Stepmother has known father's children for seven years; she was living with him when their mother was still alive. During those seven years, father's children visited father at the home where he lives with stepmother about once a month, until June 2009. V.M. did not stay overnight on these visits but spent a weekend day with her father and his family. During these visits, V.M. was always smiling and played with her father and with her nine-year-old stepbrother, with no sign of being afraid. She was happy with father and stepmother and felt at home.

In October 2008, father bought a four-bedroom house so that his wife, her children and father's children could live comfortably together. Father began asking the grandparents for more visits with V.M. because he wanted her to become closer to him so she would want to come live with him. He told the Department he understands V.M. is very attached to her grandparents and he does not want to take that away, but he wants to raise his daughter. Father

said he was willing to make a plan with the maternal relatives to see V.M. often. Father testified that early in 2009, V.M.'s grandmother began making excuses why V.M. could not visit: for example, V.M. had a cold, or a stomach ache, or a toothache, or she had to go shopping, or she had a doctor's appointment.

In September 2009, father wanted to know for himself why V.M. needed to see a doctor, so he went to V.M.'s school. Father spoke with the principal, who explained V.M. had twisted her ankle the week before and had missed a week of school but was now back at school. The principal suggested father look at V.M.'s foot himself, since she was just outside the door sitting out a physical education class. Father spoke to V.M., examined her foot, and left. He did not ask to take V.M. away from school. The principal wrote a letter less than a month later, after the detention proceedings, to clarify this was all that happened, after a social worker stated incorrectly in the detention report that the principal (whose name the social worker also reported inaccurately) had prevented father from taking V.M. out of school because his name was not on the emergency release card.

Father also decided to accompany his daughter and her grandparents to a doctor's appointment. They all went to the doctor's office, but after the visit, the grandparents "took off" with V.M., and father did not know where they went with his daughter. Father made two police reports and was told he would be asked to speak with a detective. However, by then, the grandparents had made their report of abuse and neglect to the Department, and a Department social worker, not a detective, interviewed father for the detention report.

The detention report described at length statements from the maternal relatives about father's alcohol abuse and neglect of V.M. when he was intoxicated. Of the interview with father, the social worker reported father had planned to leave his two children with their grandparents after mother's death only temporarily. Father believed the maternal grandparents had "brainwashed" the children into believing he is a "bad guy." He had a good relationship with his son until 2009, and now his son and V.M. have turned away from him. Father denied ever drinking in front of the children. He explained he has been a professional truck driver for 19 years and is tested frequently. He always provided for his children financially, and the grandparents never had to seek a court order to require him to pay child support. Only recently, he had paid for clothes for V.M. and the cost to repair the grandmother's car.

Father first learned the grandparents hired a probate lawyer to have themselves declared V.M.'s guardians when he received a copy of the

Department's detention report. In that report, the grandmother said father tried to take V.M. out of school, and later, he went to the grandparents' home and banged on the door, then called the police to try to get custody of his daughter. The grandmother immediately hired a lawyer and paid her $4,000 to apply for legal guardianship. The lawyer was reported as saying she would return "almost all of the family's money" and she "was very happy to hear that DCFS was taking care of this problem."

Father and his wife both testified that father does not drink when he picks up his kids or when they are in his home. He drinks occasionally, for example, at family reunions, but then he has one or two beers and does not get drunk. The stepmother testified father does not have a drinking problem. The last time she saw him drink was at Christmastime the year before when he drank one or two beers. Father and stepmother both testified that father does not drink when his kids are visiting because he knows he has to drive them to and from his house and does not wish to place them at risk; in addition, since he is a truck driver, he does not want to risk losing his driver's license.

Father has driven a truck making interstate deliveries for seven years, and before that, he drove a school bus for over 11 years. Father never had a conviction for driving under the influence or for any other motor vehicle offense; he never became aggressive with his wife when drinking; and stepmother never was concerned or fearful for her children because of father's drinking. Father has to submit to alcohol testing to keep his job, and he has never failed a test. In the months since the Department intervened in the family, father tested twice a month and never had a positive test.

Stepmother testified that since she and father both work, they share living expenses and talk about how to spend their money, so she knew how father gave money to support his children. He was routinely paid in cash, so he gave cash to the children's grandparents when he went to pick up his children for a visit. In addition, he deposited money into the grandmother's bank account. The grandmother had given father her account number so he could make deposits when he was driving out of state. Father did not pay an exact amount every month but paid whatever grandparents asked, varying from $100 to $500 a month. Every time the grandparents asked for money, father sent it. Father also paid part of the tuition for V.M. to attend a private Catholic school. However, in June 2009, the grandparents told father they did not need anything from him because they could take care of the children without his help.

At the conclusion of the jurisdictional hearing, the court found father and the grandparents made amicable arrangements for the care of V.M. that

changed in 2009. The court found the maternal family "does have some hostilities towards [father] believing that he—when he had enough money he can purchase a home for himself and his current wife and family and the maternal family believes that he should have provided them with substantial monies so that they can obtain a larger house." The court found the maternal family believed father received insurance proceeds upon mother's death, but the court found father's testimony to be true that he never received any death benefits and bought the house with his own money.

The court continued, "At any rate, there appears now to be a fight over the child and it may be that [father] made overtures that he wanted [V.M.] to come and make a gradual transition and ultimately live with him, and maternal family is opposed to this and that's wherein perhaps lies the hostilities. [¶] Because [V.M.] is residing with the maternal relatives and sees them as her primary caretakers, it is reasonable to believe that she wants to please them and she now is clear that she does not want to live with her father and does not want to visit with him."

The court found V.M.'s primary attachment was to her grandmother, her father was simply a "visitor," he had become a "stranger" during the months her grandparents kept her away from father, and father "has abdicated his role of father for his daughter for all of her life." The court found it "would be [a] detriment to [V.M.] to allow [father] to yank her from the stable, loving, nurturing environment" that had been hers since birth.

The court struck all of the allegations of alcohol abuse, finding no evidence to support the allegations that father abused alcohol or placed V.M. at risk of harm. The court sustained only the following allegations—none of which had been alleged by the Department, all of which the court typed up in chambers after taking evidence at the jurisdictional hearing: "The child [V.M.] has been in the care and supervision of her maternal grandmother . . . for 7 years. The child's father . . . has provided some financial support; however, other than occasional visits, he has never parented his child. Because of the lack of a parent/child relationship, [V.M.] will be traumatized and suffer detriment if she is forced to leave the care of the only caretaker she has known and had—her maternal grandmother and forced to reside with her father. Such failure to be a parent for [V.M.] and such neglect of his parental duties and responsibilities and his current request that [V.M.] be in his custody, is now causing [V.M.] to suffer harm and trauma and places her at risk of additional harm and trauma."

## DISCUSSION

"We review the juvenile court's jurisdictional findings for sufficiency of the evidence. [Citations.] We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible. [Citation.]" (*In re David M.* (2005) 134 Cal.App.4th 822, 828 [36 Cal.Rptr.3d 411].) " ' "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." [Citation.]' [Citation.]" (*Ibid.*)

Welfare and Institutions Code section 300 provides, in part: "Any child who comes within . . . the following description[] is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." (Undesignated section references are to the Welfare and Institutions Code.)

■ Manifestly, the court's jurisdictional findings and the facts of this case do not establish that V.M. has suffered or is at risk of suffering serious physical harm or illness as a result of any act or omission on the part of father. Case law demonstrates the point. (*In re X.S.* (2010) 190 Cal.App.4th 1154 [119 Cal.Rptr.3d 153] [reversing jurisdictional findings that father failed to provide for child where child was well cared for by mother and maternal grandmother until mother's recent abuse, reasoning father's failure to provide for child until after paternity was established did not cause child to suffer harm or create risk of future harm]; *In re Janet T.* (2001) 93 Cal.App.4th 377, 388–389 [113 Cal.Rptr.2d 163] [facts insufficient to support jurisdiction under § 300, subd. (b) where there was no evidence the parent's mental health problems or failure to ensure children attended school put children at substantial risk of suffering serious physical harm]; *In re Alysha S.* (1996) 51 Cal.App.4th 393 [58 Cal.Rptr.2d 494] [jurisdiction under § 300, subd. (b) improper where father allegedly committed domestic violence against mother but child did not observe and was not affected; and one year earlier, mother saw father inappropriately touch child on the buttocks and vaginal area but there was no evidence of current risk of serious physical harm].) "Subdivision (b) means

what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 823 [2 Cal.Rptr.2d 429], original italics.)

In this case, there is no evidence that father did or failed to do *anything* to or for V.M. The court struck all allegations that father placed V.M. at risk of serious physical harm. The Department did not allege that father abdicated his parental obligations, and "abdication of a parental role" is not a statutory basis for dependency jurisdiction. The Department asks us to find dependency jurisdiction under section 300, subdivision (c), on the ground that father emotionally abused V.M. We cannot affirm a jurisdictional finding that was never alleged or made in the trial court. (*In re B. G.* (1974) 11 Cal.3d 679, 688–689 [114 Cal.Rptr. 444, 523 P.2d 244] ["Since the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity to be heard."]; *In re Stacy T.* (1997) 52 Cal.App.4th 1415, 1424 [61 Cal.Rptr.2d 319] ["A parent's fundamental right to adequate notice and the opportunity to be heard in dependency matters involving potential deprivation of the parental interest [citation] has little, if any, value unless the parent is advised of the *nature* of the hearing giving rise to that opportunity, including what will be decided therein."].) In any event, there is no evidence that father emotionally abused V.M.[1]

V.M.'s counsel submitted a one-paragraph statement in support of the contentions on appeal of the Department, and we understand that V.M. would like to stay with her grandparents. Under section 356, however, when a child is not a person described by section 300, the court shall order that the petition be dismissed and the child discharged from any detention or restriction theretofore ordered. That is what the trial court should have done here.

---

[1] On October 21, 2010, the Department filed a motion to take additional evidence of postjudgment events. The motion asks us to take judicial notice and receive additional evidence that, at a hearing held on September 2, 2010, the trial court sustained a petition under section 342, amending the original petition to declare V.M. a dependent under both subdivisions (b) and (c) of section 300. We take judicial notice to the limited extent that we notice the minutes of proceedings reflect the trial court heard additional testimony from grandparents and father on September 2, 2010. None of that evidence is before us. We denied the Department's request based on the well-established principle that an appellate court reviews the correctness of a judgment as of the time it is rendered, based on the evidence that was before the trial court for consideration at that time. (*In re James V.* (1979) 90 Cal.App.3d 300, 304 [153 Cal.Rptr. 334].) This is not one of those rare cases presenting unusual, compelling new circumstances that would justify this court taking additional evidence. Accordingly, we express no opinion whether on this record, or at the September 2, 2010 hearing, the evidence supported jurisdiction under section 300, subdivision (c).

## DISPOSITION

The jurisdictional and dispositional orders are reversed as to V.M. The court is ordered to dismiss the petition as to V.M. forthwith unless new circumstances would justify a new finding of jurisdiction.

Rubin, Acting P. J., and O'Connell, J.,* concurred.

A petition for a rehearing was denied January 21, 2011, and the opinion was modified to read as printed above.

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.