Filed 7/10/15  In re M.C. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | B259200 (Los Angeles County Super. Ct. No. CK47956) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MICHAEL C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Teresa Sullivan, Judge.  Affirmed.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kimberly Roura, Deputy County General, for Plaintiff and Respondent.

* * * * * *

Father Michael C. appeals from the jurisdiction and disposition order finding that his son M.C. was a child described by Welfare and Institutions Code section 300, subdivisions (b) and (g),[1] and removing M.C. from father's custody. Father contends substantial evidence did not support the jurisdictional finding. We affirm.

## FACTS AND PROCEDURE

### 1. *Detention on Initial Petition*

Eleven-year-old M.C. was removed from his mother in May 2013 after a referral alleged physical abuse by mother. M.C. reported that mother punched and kicked him and pushed his head against a refrigerator.[2] The social worker with the Los Angeles County Department of Children and Family Services (DCFS) interviewed maternal grandmother and learned that mother, father, and M.C. had been living with maternal grandmother for the past five months, though father worked "all the time and [was] not home." M.C. had a black eye and a sore rib from mother's punching and kicking him. He also showed the social worker bruises on his legs from when mother hit him with an extension cord. Maternal grandmother saw mother hit M.C. and told him to run. She also told mother to stop or maternal grandmother would call the police. M.C. had seen mother hit father and seen mother threaten to hit maternal grandmother. M.C. thought both he and mother had "anger issues," and he wanted them to get counseling. M.C. had a lengthy record of disciplinary issues at school for bullying and harassing other students. Maternal grandmother was willing to provide care for M.C. and have mother move out of the home so M.C. could stay there.

Mother and father had been together for 16 years but were not legally married. The social worker contacted father by telephone. Father is a truck driver. He was working out

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother is not party to this appeal. Mother had a prior dependency case in 2002 in which the court sustained allegations that she had inappropriately physically disciplined M.C.'s half sister, had a history of marijuana use, and had a criminal conviction for assault with a deadly weapon.

of town and had not been home for a month. Father denied knowing about any physical abuse by mother. The removal order DCFS obtained applied only to mother, not father. Father explained that he was on an out-of-state run but would return home in two weeks. He gave DCFS permission to place M.C. in a foster home until he returned. DCFS placed M.C. with maternal grandmother. The placement was against mother's wishes; she blamed maternal grandmother "for what [was] going on." Father did not want to decide whether to place M.C. with maternal grandmother because he did not "want to be . . . caught in the middle" of mother and maternal grandmother. But he did not have any concerns about maternal grandmother caring for M.C. Father said he would fax a letter giving maternal grandmother authorization to attend to M.C.'s medical and educational needs.

At the detention hearing, the court found a prima facie case for detaining M.C. from mother. The court released M.C. to father with the understanding that father planned to leave M.C. with maternal grandmother while he was out of town working.

## 2. *Jurisdiction and Disposition on Initial Petition*

M.C. indicated that, if father continued to do long-term trucking jobs, he would want to live with maternal grandmother. According to the jurisdiction/disposition report, maternal grandmother was concerned that father might want to take M.C. on the road with him because she felt trucking was not an appropriate lifestyle for a child. She felt that M.C. needed his father, but father did not have a home, and M.C. could not live with father while he drove from state to state on his trucking jobs. Maternal grandmother was happy to continue caring for M.C. if that was what father wanted, but she needed financial help. She explained: "I am on a fixed income, social security and I can't afford to pay for all the things [M.C.] needs. I need money for gas, clothes, shoes and other things, too." The social worker explained to maternal grandmother that she was not eligible to receive funding from DCFS because M.C. had not been detained from father and was in father's custody. If father could not provide maternal grandmother with funds to care for M.C., then father would have to make another plan for his care.

Father was hoping that maternal grandmother would permit M.C. to stay with her, though father wanted to take M.C. on his trucking runs for a period while M.C. was on

3

summer break from school. But he wanted M.C. to stay with maternal grandmother until M.C. could reunify with mother. Father indicated that he was aware maternal grandmother needed financial help to care for M.C. He was in training on the job and had not received a paycheck yet. He would complete training in June 2013, and once he did, he would start sending money to maternal grandmother to provide for M.C.'s needs. He was upset that maternal grandmother persisted in asking the social worker for financial assistance because he had spoken to maternal grandmother about his training, and he thought they had an understanding that he would send her money once he was paid.

Mother pleaded no contest to the petition. The court sustained the allegation under section 300, subdivision (a) that she had inappropriately disciplined M.C. using an extension cord and belt. The court dismissed without prejudice the section 300, subdivision (b) allegations that mother physically abused M.C. and father knew of it or reasonably should have known but failed to protect M.C. It also dismissed without prejudice the allegation that mother had an 11-year history of illicit drug use and was a current abuser of marijuana. The court entered a home-of-father placement order, on the condition that M.C. would stay with maternal grandmother while father was working. The court ordered family reunifications services for mother, family maintenance services for father, and counseling for M.C. to address abuse and bullying issues.

### 3. Six-month Review

Maternal grandmother had been caring for M.C. throughout the six-month review period with no financial assistance from father, and father had not faxed her a letter giving her authority to tend to M.C.'s medical and education needs, as he said he would at the time of detention. She continued to be willing to care for him, but again expressed that she needed financial assistance. She was also concerned that she did not have written consent from father to tend to M.C.'s medical and education needs. Father did buy M.C. school clothes prior to the start of the new school year. He had visited with M.C. three times during the six-month review period and called sporadically. But when maternal grandmother tried to call father, he never answered his phone. Maternal grandmother did

4

not have regular contact with mother either. Mother was also travelling with father on his trucking jobs.

M.C. had been in counseling and was making progress, in terms of his aggressive behaviors. His therapist was recommending conjoint therapy with father, as soon as father could make it in for an appointment. Maternal grandmother indicated she was able to enroll M.C. in counseling because the staff at the counseling office knew her and permitted her to do it. The social worker indicated in the DCFS report that she was concerned neither parent had given maternal grandmother written consent to deal with M.C.'s medical and education needs, even after several requests from DCFS. The social worker had tried to contact both parents by phone and had not received return calls from either one. DCFS was planning to seek a warrant removal order from father and was hoping to formally place M.C. with maternal grandmother. Because of the lack of financial assistance from father, the failure to provide medical and educational consents after repeated requests, and the parent's ignoring the social worker's phone calls, DCFS felt father's plan for M.C. was "no longer . . . safely appropriate." DCFS further felt both parents had "basically abandoned their son with[out] making plans and provisions for his overall safety and well being."

At the January 2014 review hearing, the court found conditions for taking jurisdiction continued to exist and ordered continued services for the parents.

## 4. Subsequent Petition

In April 2014, DCFS filed a subsequent petition[3] containing allegations under section 300, subdivisions (b) and (g). The petition alleged (1) father had made an inappropriate plan for M.C.'s ongoing care and supervision by leaving M.C. with maternal grandmother, who was unable to provide ongoing care and supervision for M.C. without assistance from

---

[3] Section 342 governs subsequent petitions and states: "In any case in which a minor has been found to be a person described by Section 300 and the petitioner alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300, the petitioner shall file a subsequent petition."

father; (2) father failed to maintain medical insurance for M.C., resulting in his mental health services being terminated; and (3) father failed to inform maternal grandmother of his whereabouts and failed to maintain regular contact with maternal grandmother and M.C. The court found a prima facie case for detaining M.C. from father and ordered him placed with maternal grandmother.

The social worker's statements in support of the removal order and the jurisdiction/disposition report set forth the following. The social worker had been trying to contact father since July 2013 to ask him to send a medical and educational consent for M.C. After three unreturned calls on three different days in July, the social worker tried mother, who returned her call and was traveling with father. Mother stated that the social worker had not received a faxed letter of consent because the fax machines at all the rest stops they tried did not work. The social worker explained she needed to speak to father to determine whether there was an issue with M.C. being placed in father's custody. Mother replied, "do what you gotta do and we will do what we gotta do," then hung up the phone. Four days later, the social worker left father another message requesting that he send a medical and educational consent letter. After approximately two weeks went by and she had not received the consent letter, the social worker called father again. He answered, but when the social worker identified herself, he hung up the phone. She called back and left another message. By November 2013, the social worker still had not received the consent letter. She called and left mother and father still another message.

After the review hearing in January 2014, the social worker spoke to father, who said he had left the consent letter at maternal grandmother's house ("on the top of the TV") when he was in town during M.C.'s holiday break. The social worker alerted maternal grandmother, who then found the letter.[4]

---

[4] The letter, dated January 11, 2014, stated in pertinent part: "To whom it may concern, [¶] I [father] give my permission to [maternal grandmother] for only school and medical issues for [M.C.]. If you have any questions, please feel free to contact me . . . ."

In February 2014, M.C.'s therapist called the social worker to say she had to terminate his services because he no longer had insurance through Medi-Cal. The social worker left messages with mother and father to see whether they could resolve the Medi-Cal issue, but as of April, M.C. still did not have medical insurance. Maternal grandmother was concerned because M.C. was much more stable when he was receiving counseling services. M.C. displayed defiant behaviors with maternal grandmother, displayed anger issues, and appeared unmotivated.

The social worker met with mother and father informally in April 2014. Mother was living in Las Vegas and said she did not have a place to live in California. Father and mother asked about mother being M.C.'s caretaker. The social worker informed them that she could not be his caretaker for the time being because the court had detained M.C. from her for physical abuse. Father had no family or other support system to help with M.C. (other than maternal grandmother). Both parents reported that they did not have medical insurance at the time either, and they "d[id] not have the time to fix the issue" for M.C. at the moment. Father said he planned to have his truck driving job only until the end of the year, and then he would find local work. Father reported that he gave M.C. money and purchased clothes for him when he visited, which M.C. confirmed. Maternal grandmother, however, never received any financial support from father. M.C. was growing out of the clothes father bought for him. Father did not want to give money directly to maternal grandmother because of "ongoing issues between all parties."

According to M.C., he had a cellular phone that his parents had given him, and he talked to them on it every day or every other day. Father visited him when he was in town several times, and M.C. went trucking with him and mother during M.C.'s holiday break in December 2013 and spring break in 2014.

By July 2014, M.C. had improved in terms of his behavior and defiance with maternal grandmother, but he wanted to live with mother and father and was upset that he could not. Father still had his trucking job and was willing to participate in conjoint counseling over the phone or in person with notice. Mother had begun complying with the case plan that the court ordered, and she and father were trying to find a residence in

Victorville to be closer to M.C. and make reunification more productive. Maternal grandmother continued to be willing to care for M.C. but could not without financial help from father.

At the jurisdiction and disposition hearing, the court struck the allegation that father failed to maintain medical insurance for M.C., on the ground that father did not have a legal obligation to provide medical insurance, but it otherwise sustained the subsequent petition and found M.C. was a person described by section 300, subdivisions (b) and (g). The court ordered M.C. removed from father and suitably placed with maternal grandmother. The court explained its ruling thusly: "The evidence in this case regarding the allegations is based primarily on the evidence from the caretaker. [¶] So, clearly, if this was an appropriate plan and one that was being supported by the parents, the caretaker wouldn't be struggling and making the statements that the caretaker was making. [¶] The parents have not put themselves in a position to be able to care for their children by their choices at this time. [¶] So the choices would be foster care or grandma. [¶] So that's why grandma's involved."

The court ordered individual counseling for M.C. and conjoint counseling with both parents if recommended by M.C.'s therapist. It also ordered father to complete a parenting class for adolescents and family counseling, including with the maternal grandmother. It granted father unmonitored visitation. Father filed a timely notice of appeal.

## DISCUSSION

Father contends we must reverse because substantial evidence did not support the court's jurisdictional finding that M.C. was a person described by section 300, subdivisions (b) and (g). We disagree.

In reviewing the jurisdictional findings of the court, "we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the

8

evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) If supported by substantial evidence, we must uphold the challenged findings, even though substantial evidence to the contrary may also exist, and the juvenile court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

In relevant part, section 300, subdivision (b)(1) provides for juvenile court jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." The relevant part of section 300, subdivision (g) provides for juvenile court jurisdiction if "[t]he child has been left without any provision for support." Section 300, subdivision (g) does not require a finding of harm or risk of harm. (*In re J.O.* (2009) 178 Cal.App.4th 139, 153.) Further, the ground that a child has been left without any provision for support does *not* require the additional finding that the parent is "'unwilling or unable'" to provide care or support for the child. (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1128-1129.)

Here, substantial evidence supported the court's conclusion that father had left M.C. without any provision for support. Father's plan was for maternal grandmother to care for M.C. while he was traveling for his trucking job. Father has no other family or support system that could care for M.C. while he was on the road. Mother could not take care of M.C. because he was detained from her on the initial petition in May 2013. Father was aware from the first that maternal grandmother had limited income and needed financial assistance to care for M.C. In June 2013, father said that he would complete training that month and could begin sending money to maternal grandmother. He believed he and maternal grandmother had an understanding about this. He never did send money to her. Father contends he did not fail to provide any support for M.C. because he bought him school clothes and gave him money when he visited. This argument is unavailing. There is no evidence in the record of how much money he gave M.C., but that money does not appear to have ever made it from the child to maternal grandmother. Father did not want to

give money directly to maternal grandmother because of unspecified "ongoing issues." Whatever the ongoing issues, father had designated a caregiver who said she could provide care only if father provided financial assistance. Father did not do so, and he could not identify any other possible caregivers.

Father further argues that he did not leave M.C. without any provision for support because maternal grandmother had been supporting M.C. on an ongoing basis without his financial assistance. He points out there was no evidence that M.C. "suffered malnutrition, or was left homeless, or was without daily necessities." First, section 300, subdivision (g) does not require a finding that the child be suffering from these conditions. Section 300, subdivision (b) requires "the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment," but that is not the ground for jurisdiction at issue here. Second, that maternal grandmother had somehow managed to care for M.C. without assistance during the year that he was living with her does not mean her need was any less real, especially if the situation was going to continue. She was on a fixed income of social security. She had consistently requested financial assistance right up to the jurisdiction hearing on the instant petition. It is understandable that maternal grandmother would have tried to stretch her income rather than put M.C. out of her home. But father's argument amounts to speculation that she could continue to care for M.C. indefinitely without assistance. Her continued requests for assistance were evidence to the contrary.

*In re Matthew S.* (1996) 41 Cal.App.4th 1311, on which father relies, does not compel a contrary result. In that case, the mother suffered from troubling delusions and had admitted psychiatric problems. (*Id.* at p. 1314.) Her employer had recently terminated her for refusing to undergo therapy. (*Id.* at p. 1315.) The father lived in Brazil and erratically sent support of $900 per month. (*Ibid.*) The children were temporarily placed in protective custody with distant relatives for six days and then permitted to return to their mother's home well before the jurisdiction hearing. (*Ibid*.) The petition contained allegations under section 300, subdivisions (b), (c), (d), and (g). (*Matthew S.*, at p. 1315.) The section 300, subdivision (g) allegations stated "that the children have been left without any provision for

10

support in that their father is employed in Brazil and [the mother] has primary physical custody." (*Matthew S.*, at p. 1315.) After the allegations relating to one child were dismissed, the court sustained the section 300, subdivision (g) allegations, among others, as to the other child and permitted him to reside with the mother under family maintenance services. (*Matthew S.*, at p. 1318.) The appellate court held substantial evidence did not support the finding that the child had been left without provision for support under section 300, subdivision (g) because, while the mother's financial resources were strained and she had recently lost her job, she had been supporting the children for years, continued to do so, and was seeking new employment. (*Matthew S.*, at p. 1320.) Also, there was "no evidence of malnutrition, deprivation of shelter, clothes or medical care." (*Ibid.*) Thus, the child in *Matthew S.* lived with and was supported by his mother. Here, by contrast, father acknowledged he could not care for M.C. and had to make another plan for the child's care. The mother in *Matthew S.* never said she needed financial assistance to care for her children, unlike the caregiver here.

Because substantial evidence supported the court's jurisdiction under section 300, subdivision (g), and the court's jurisdiction may rest on a single ground, we need not consider whether jurisdiction was also appropriate under section 300, subdivision (b). (*D.M. v. Superior Court, supra*, 173 Cal.App.4th at p. 1127.) Still, we note that the section 300, subdivision (b) case on which father primarily relies, *In re V.M.* (2010) 191 Cal.App.4th 245, is distinguishable. The *In re V.M.* court held substantial evidence did not support the juvenile court's finding that the child had suffered or was at substantial risk of suffering serious physical harm or illness (§ 300, subd. (b)(1)). (*In re V.M., supra*, at p. 252.) The child's mother was deceased and she had lived with her maternal grandparents all her life, but the father had consistently visited her. (*Id.* at p. 248.) The father had been a professional truck driver for 19 years. (*Id.* at p. 249.) He always provided for his child financially and the grandparents were never required to seek a court order for him to pay child support. (*Ibid.*) He paid whatever the grandparents asked, varying from $100 to $500 per month. He never refused the grandparents' request for money. (*Id.* at p. 250.) He gave cash to the grandparents when he picked up the child for visits, and he had the

11

grandmother's bank account number and deposited money directly into it when he was driving out of state. (*Ibid*.) He had just paid to repair the grandmother's car. (*Id*. at p. 249.) He also paid for part of the child's private school tuition. (*Id*. at p. 250.) At some point, the grandparents actually told the father that they could take care of the child without his help and they needed nothing further from him. (*Ibid.*) This case, in which father has never given maternal grandmother financial support, is quite manifestly different.

## DISPOSITION

The order is affirmed.

FLIER, J.

WE CONCUR:

RUBIN, Acting P. J.

GRIMES, J.

12