Filed 1/9/25  In re B.P. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re B.P. et al., Persons Coming Under the Juvenile Court Law. | H051748, H052054 (Monterey County Super. Ct. Nos. 23JD000112, 23JD000113, 23JD000114, 23JD000115) |
| MONTEREY COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.P.,<br><br>Defendant and Appellant. | |

Appellant J.P. (Father) filed two appeals[1] from the juvenile court's orders, including the findings and orders adjudicating his four children as dependents under Welfare and Institutions Code section 300[2] and removing them from his care.  Father contends (1) the court violated his constitutional rights by denying him a contested jurisdictional hearing; and (2) the jurisdictional findings and disposition orders removing his children and restricting his visitation are not supported by substantial evidence.

---

[1] We ordered both appeals (appeal Nos. H051748, H052054) considered together for purposes of briefing, argument, and disposition.

[2] Unless otherwise specified, all undesignated statutory references are to the Welfare and Institutions Code.

Respondent Monterey County Department of Social Services (the Department) contends Father's appeals should be dismissed as untimely and moot, and, in any event, the court's findings and orders were supported by substantial evidence. Mother M.P. (Mother) is not a party to either appeal. For the reasons stated below, we dismiss Father's first appeal (appeal No. H051748), we review the merits of Father's second appeal (appeal No. H052054), and we reverse, in part, the court's jurisdictional findings and disposition orders.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother are married and have four children involved in this dependency proceeding: B.P., also known as N.P. (born 2007),[3] Jk.P. (born 2009), Ja.P. (born 2012), and H.P. (born 2020). Although the family—Mother, in particular—has been involved in prior dependency cases, the family's last dependency case was dismissed in 2019 after the parents completed their reunification plan.

### A. Events Leading Up to Dependency Proceedings

In late 2023, the Department received a referral concerning N.P. after he was hospitalized for attempting to harm himself. N.P. reported the following to hospital staff: his home was littered with animal and rodent waste, contained mold, his bedroom and the kitchen were infested with rats, Father smoked methamphetamine in the garage, Father and Mother argued, Mother's friend used drugs in front of the children, Father made statements threatening to kill Mother and urinate in her drinks, and his parents kept his youngest sibling, H.P., in her high chair for up to 10 hours a day. N.P. stated that he did not want to go home and, if forced to do so, he would kill himself.

The Department started an immediate investigation. N.P. made the same statements to the social worker and expressed concern for his siblings. N.P. claimed

_____

[3] B.P. prefers to be called N.P. and identifies with pronouns he/his/him. We will refer to the minor by his preferred name and pronouns, as did the parties in the underlying proceedings and appellate briefs.

2

Father hit Jk.P. with a belt two weeks prior for exposing his private parts to his siblings. When H.P. misbehaved, she was "smacked" in the face and got "her hair pulled" (the record does not identify which parent committed these alleged acts). N.P. alleged that his parents were unsupportive of his gender transition, called him names, were inattentive to his dental needs, and Mother previously gave him marijuana and cigarettes. N.P. found a bag with powdery substance in the garage a few weeks prior. N.P. stated his parents argued frequently and, sometimes the arguments were physical; Mother threw objects at Father and hit him with a stick. N.P. had not seen Father carry out the threat to urinate in Mother's drinks. N.P. stated he felt unsafe with his parents and asked for help.

The same day, a social worker from the Department interviewed N.P.'s younger siblings, Jk.P. and Ja.P., at their schools. Jk.P. appeared nervous and stated he needed to call Father before speaking to a social worker, but the interview proceeded regardless. Jk.P. was clean and had no visible injuries, marks or bruises. Jk.P. provided cursory responses and mentioned he did not want to be "taken away" like last time. He denied any domestic violence between his parents, denied any physical discipline and abuse by his parents, and stated "everything is fine." As to Ja.P., he appeared happy, healthy, and clean with no visible injuries, marks, or bruises. Ja.P. reported that his parents argued and said bad words to each other, and Mother had hit Father on the back of the head. Ja.P. stated that Mother yelled and called Ja.P. profane names, but Father told her to stop and protected him. For discipline, Ja.P. responded that his parents would send him to his room, although they had hit him and his siblings with a belt and a hanger, most recently in the previous week. Ja.P. reported that Mother hit Jk.P. with a belt recently because Jk.P.'s music was too loud, but Ja.P. did not know if Jk.P. sustained any injuries. As to the conditions of the home, Ja.P. stated that the family's two dogs sometimes urinated or defected in the house, but Father would clean it up. Father usually did the laundry at home and sometimes cooked. Ja.P. denied seeing rodents in the home but had seen them in the backyard.

3

With regard to N.P.'s hospitalization, Jk.P. and Ja.P. both stated, in their separate interviews, that N.P. had been depressed since he recently broke up with his boyfriend, S., of whom the parents disapproved.

After the children's interviews, the social worker met with the parents in a parking lot near Mother's doctor's office, as that was the most convenient location for the family at that time. All three children—Jk.P., Ja.P., and H.P.—were present in the family vehicle. H.P. appeared happy, healthy, and clean with no visible injuries, marks or bruises. Father denied using physical discipline, hitting the children, domestic violence, and drug use. Father believed N.P. reported the family to the Department after Father and Mother prohibited N.P. from talking to S., a friend he met online. Father stated they saw an adverse change in N.P.'s mental state and social interactions after he met S., whom they later realized was an adult male and not a teenager.

Mother blamed N.P. for making up the allegations of abuse at home after she and Father banned N.P. from speaking to S. Both parents claimed they supported N.P.'s gender identity; Father stated that he took N.P. to school to change his identification to his preferred name and that the family had gone to two pride events with N.P.

Later that evening, the social worker, accompanied by law enforcement, made a scheduled visit to inspect the family's home.[4] The social worker noted that the home appeared recently cleaned because the floors were wet and the fan was on, although the weather was cold outside. N.P.'s room appeared messy with clothes on the floor and bed. Jk.P. and Ja.P. shared a room with a bunk bed, and there was a crib in the master bedroom for H.P. The bathrooms appeared dirty and stained. The home had running water, electricity, food, and clean clothing. Father allowed the Department to inspect the garage, which was cluttered and had cigarette boxes on the floor.

---

[4] The record does not explain why the Department requested law enforcement's presence at the home inspection or why it believed such assistance was necessary.

Following the inspection, the parents continued to deny the allegations. Mother interrupted Father's conversation with the social worker, yelled, and paced back and forth. When the social worker informed the parents of the Department's intent to take the children into protective custody, Father and Mother yelled at the social worker and called her a liar. Father instructed the children to begin recording the social worker, and Mother made threats that she would make the social worker's personal life "a living hell." Law enforcement declined to assist the Department in taking the children into their custody, instructing the social worker to either obtain a warrant or initiate dependency proceedings. The social worker asked Father if the family would participate in an emergency response child and family team meeting (CFT) and Father agreed. Pending the CFT, at the social worker's request, Father voluntarily agreed to have the children stay with his mother (Paternal Grandmother).

The next day, at the CFT with the parents and Paternal Grandmother, Mother was disruptive, and Father appeared to fall asleep throughout the meeting. The parents continued to accuse N.P. of making false allegations.

### B.     *The Petitions Filed by the Department*

Immediately after the CFT, the Department initiated dependency proceedings under sections (a) (physical harm) and (b) (neglect) for all four children, and an additional allegation under section (c) (emotional harm) for N.P. only. The petition for each child alleged the same 15 paragraphs (b-1 through b-15) as the basis for jurisdiction under section 300, subdivisions (a), (b), and (c).

Paragraphs b-1 and b-2 contained allegations regarding Mother's prior dependency cases in the early 2000s involving her children from a different relationship wherein her parental rights were terminated. Paragraph b-3 included a summary of the parents' minimal involvement in voluntary family maintenance services in 2012 when Mother and newborn Ja.P. tested positive for methamphetamines, as well as the family's

prior 2017 dependency case based on allegations of physical abuse, the parents' completion of services, and the dismissal of that case in 2019. Paragraphs b-4 to b-14 contained descriptions of the events leading up to the instant dependency proceedings, as summarized above. The last paragraph included the Department's declarations that it made reasonable efforts to prevent removal by setting a CFT with the family, developing a safety plan, and exploring relative placement, and that removal was necessary due to emotional abuse endured by N.P., domestic violence between the parents, physical abuse of the children, and the parents' denial of the allegations.

### C. The Detention Hearing

At the detention hearing on December 4, 2023, the court appointed counsel for the parents and children. All family members, except H.P., were present.[5] Mother's counsel specially appeared on behalf of Father's counsel to accept the appointment, stipulate to waivers, and enter the parents' denials to the allegations in the petition. Mother's counsel represented that the parents had no objection to the Department's request for drug testing and agreed to detention, provided the children were placed with Paternal Grandmother. The court asked if the children were currently placed with Paternal Grandmother, and Mother's counsel affirmed. The Department did not object or contradict counsel's representation that the children were with Paternal Grandmother.

The court made the requisite findings for detention, ordered drug testing for both parents, and set the matter for a jurisdiction and disposition hearing. Immediately after the hearing, a social worker from the Department informed the family that the children would not be placed with Paternal Grandmother, as the approval process remained pending, and there were concerns Paternal Grandmother allowed Father to stay in her home and help with the children. The social worker requested that the parents immediately surrender physical custody of the children, which caused Jk.P., Ja.P., and the

---

[5] N.P. appeared remotely from the hospital.

parents to become visibly upset. The children were then transported to a temporary housing facility.

On January 10, 2024, Father filed a notice of appeal of the orders entered at the detention hearing.

### D.        *The January 16 Jurisdiction and Disposition Hearing*

Prior to the hearing, the Department filed a jurisdiction and disposition report (report), which included the social worker's investigation summaries and the recommended case plan. The report included the social worker's conclusions that, based on her interviews and inquiries, she believed the allegations of physical abuse and general neglect were inconclusive for all four children, and that the allegation of emotional abuse was substantiated for N.P., Jk.P., and Ja.P. and inconclusive for the youngest, H.P. The social worker noted that she "did not find enough evidence that would indicate general neglect as defined in [Penal Code § 11165.2]" and she "did not find sufficient information to determine physical abuse has occurred pursuant to [Penal Code § 11165.4]." As to her "safety and risk assessment," she concluded, "[o]ne or more safety threats are present; however, the child can safely remain in the home with a safety plan." The Department's report also included a recent letter from an intake coordinator noting that Father participated in a substance use disorder screening and no further assessment was necessary as Father was not at high risk for relapse.

The report also indicated that all four siblings had been placed in different homes multiple times due to their disruptive behaviors, with only Jk.P. living with Paternal Grandmother. The four supervised visits for the family had been chaotic, with some ending in physical altercations between Jk.P. and Ja.P., yelling, crying, and name-calling amongst the children. Jk.P. told his parents to "shut up," called them and his siblings derogatory names, and threw food at Father. Ja.P. yelled at his parents and "flipped off"

7

Father, and H.P. threw herself on the floor and cried.  Father was attentive to the children during the visits, redirected them when they misbehaved, and tried to calm them.

On January 16, 2024, the parties appeared for the jurisdiction and disposition hearing.  Father, represented by his counsel, contested the allegations and asked the matter to be set for a contested hearing.  Mother, represented by her counsel, stated she was not contesting the allegations and submitted on the social worker's report.

While the court looked for dates to set the contested hearing, the Department's counsel asked the court to make the findings and orders regarding Mother only since she was not contesting the allegations.  The judicial officer asked the Department's counsel, "Since we're making findings about mom, but not dad, are there any interim findings that need to be made about dad to continue jurisdiction or Title IV E or anything else?"  Counsel responded, "No.  As I think we're fine because the court made the detention hearings[*sic*].  And as to mom, I think we can just modify them just to make sure that it is just as to the father."

With no objections from the parents, the court admitted the report into evidence, found the allegations regarding Mother in the petitions for all four children to be true, and made findings that all four children were persons described under section 300, subdivisions (a) and (b), and, as to N.P. only, section 300, subdivision (c).  As to disposition, the court found there was a substantial danger to the physical health, safety, and emotional well-being of the children if they were returned home, the children had suffered severe emotional damage, and there were no reasonable means to protect the children without removal under section 361, subdivision (c).  The order stated that the "[t]he factual basis for the above finding is set forth in the report of the court social worker, in the section entitled, 'Children's Safety in the home.' "  The court ordered family reunification services to be provided to Mother, noting "Father is contesting."

The court continued the hearing as to Father to February 2024 and then, at Father's request due to the unavailability of his counsel, to March 19, 2024.

### E. The March 19 Continued Jurisdiction and Disposition Hearing

At the continued hearing on March 19, the Department submitted based on the evidence already admitted at the January 16 hearing.[6] The Department, represented by the same attorney who had appeared at the previous hearing, argued that Father's jurisdiction hearing was moot since the court had already made the jurisdictional findings at the last hearing for Mother. Father's counsel conceded but stated that Father wanted to put his objections regarding jurisdiction on the record. The court responded, "[Father's] request to readdress the jurisdictional issue is denied. If you'd like to swear [Father] in and talk about disposition, we can move forward on that. But he'll need to keep it pretty limited. Because if it bleeds off into -- back into arguing jurisdiction, that is just not an issue today."

Father thereafter testified that he would cooperate with the Department's recommended services for himself and the children. Father provided proof of a recent negative drug test result, which was admitted into evidence. On cross-examination, Father conceded he did not cooperate with the prior order for random drug testing. Father testified that he did not have legal representation at the initial hearing when the drug testing orders were made and, even if he had legal representation, he would not have agreed to the testing. Father stated that his alleged drug use was not the reason the family "came to this court[.]" He acknowledged that his children had behavioral issues requiring therapy but did not believe their behavior was abnormal for children of their ages.

Father argued for the children's return to his custody. He was in frequent contact with the Department, participated in visitation, attended parenting classes, and expressed willingness to comply with the Department's recommended services. Acknowledging

_____

[6] The court also admitted the Department's interim report related to a prior hearing on N.P.'s placement in a short-term residential treatment program due to N.P.'s ongoing mental and emotional issues in other placements.

9

Father's participation, counsel for the Department argued it was still too early in the proceedings to return the children, and the risk for danger continued to exist in the home. Relying on the findings already made against Mother, and absent evidence showing Mother's circumstances had changed, the Department argued removal remained necessary. Mother was not present at the hearing, although her counsel was present.

At the conclusion of the hearing, the court found it would be unsafe to return the children to Father. The court stated, "Dad, you're starting to make some progress, and I applaud you for that, but you have a long way to go. I'm frankly surprised that you don't recognize and clearly state that you understand how messed up all these kids are. And, frankly, until you're able to do that, I don't see returning these children to you." The court found the allegations in the petitions true as to Father, entered the same jurisdictional findings and dispositional orders as were entered at the prior hearing as to Mother, including adopting the Department's recommended case plan, and ordered visitation at least once per month or as directed by the Department.

On April 5, 2024, Father filed a second notice of appeal to challenge "all detention, jurisdiction, and disposition findings and orders involving all children."

## II.  DISCUSSION

Father and the Department raise multiple arguments on appeal, which we discuss in the following sequence:  (1) The Department's contention that Father's appeals are untimely and moot; (2) Father's contention that the juvenile court violated his constitutional rights by denying him a contested jurisdiction hearing; and (3) Father's contentions that the jurisdictional findings and dispositional orders as to Jk.P., Ja.P., and H.P. lack substantial evidence to justify removal and limited visitation orders. For the reasons stated below, we conclude:  (1) we have jurisdiction to consider Father's second appeal (appeal No. H052054) but we dismiss Father's first appeal (appeal No. H051748) as from a nonappealable order; (2) the juvenile court violated Father's right to due

10

process and such error was not harmless; and (3) the challenged jurisdictional findings and dispositional orders as to Jk.P., Ja.P., and H.P. are not supported by substantial evidence. For the reasons we explain below, we reverse the dispositional orders in part.[7]

### A.     Appealability

We ordered Father's appeals considered together only for purposes of briefing, argument, and disposition. The Department contends that both appeals should be dismissed as improper and untimely.

#### 1.     Father's First Appeal (Appeal No. H051748)

We dismiss Father's appeal of the detention orders entered on December 4, 2023, as taken from a nonappealable order. " ' "[N]o appeal can be taken except from an appealable order or judgment, as defined in the statutes and developed by the case law. . . ." [Citation.]' " (*City of Gardena v. Rikuo Corp.* (2011) 192 Cal.App.4th 595, 601, italics omitted.) "The existence of an appealable order or judgment is a jurisdictional prerequisite to an appeal." (*Canandaigua Wine Co., Inc. v. County of Madera* (2009) 177 Cal.App.4th 298, 302.)

Section 395 defines the appealable orders and judgments in dependency proceedings as follows: "[a] judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." (*Id.*, subd. (a)(1).) The dispositional order is considered the "judgment" and is generally the first appealable order in dependency proceedings. (*In re Javier G.* (2005) 130 Cal.App.4th 1195, 1999 (*Javier G.*); *In re Sheila B.* (1993) 19 Cal.App.4th 187, 196 (*Sheila B.*).) Orders made before the

---

[7] Although Father's notice of appeal identified his appeal of the orders for all four children, he clarified in his opening brief that he challenges only the orders pertaining to Jk.P., Ja.P., and H.P. Father raises no arguments for the orders related to N.P. Accordingly, we dismiss as abandoned the portions of the appeal of findings and orders as to N.P. (See *In re Sade C.* (1996) 13 Cal.4th 952, 994.)

11

disposition hearing, such as detention orders and jurisdictional findings, are interlocutory and not directly appealable. (*In re B.P.* (2020) 49 Cal.App.5th 886, 889-890.)

Father's first notice of appeal sought review of the detention orders which are interlocutory and not appealable. Father insists his notice of appeal included his appeal of the initial dispositional orders entered at the January 16, 2024 hearing, not the detention orders entered on December 4, 2023. The record does not support these claims. Father's notice of appeal expressly states: "I appeal from the findings and orders of the court (*specify date of order or describe order*): 12/04/2023 Detention orders[.]" Further, Father filed his notice of appeal on January 10, six days before the initial jurisdiction and disposition hearing on January 16. Father thus could not have appealed the January 16 orders as they had not yet been determined when Father filed his first appeal on January 10. Although a reviewing court liberally construes a notice of appeal in favor of their sufficiency (Cal. Rules of Court, rule 8.405(a)(3))[8], the rule is inapplicable to appeals filed before the rendition of any judgment, order, or announcement of the court's intended decision. (*First American Title Co. v. Mirzaian* (2003) 108 Cal.App.4th 956, 960-961.) Accordingly, we must dismiss Father's first appeal (appeal No. H051748).

### 2. Father's Second Appeal (Appeal No. H052054)

After the March 19, 2024 continued jurisdiction and disposition hearing,[9] Father filed his second notice of appeal on April 5, 2024 to challenge "all detention, jurisdiction, and disposition findings and orders involving all children." The Department contends the

---

[8] Subsequent undesignated references to rules of court are to the California Rules of Court.

[9] Father's second notice of appeal listed the continued jurisdiction and disposition hearing as March 29, 2024, instead of the correct date of March 19, 2024. We liberally construe the notice of appeal in favor of its sufficiency and protect the right of appeal where it is reasonably clear what the appellant was trying to appeal from and where the respondent could not possibly have been misled or prejudiced. (*In re Joshua S.* (2007) 41 Cal.4th 261, 272.) The Department does not argue that Father's notice of appeal failed to provide sufficient notice. Accordingly, we construe Father's notice to include his appeal of the orders entered on March 19, 2024.

time to appeal commenced upon the dispositional orders entered against Mother on January 16, 2024, since there can only be one simultaneous disposition. The Department argues that Father's time to appeal the orders at issue in this case expired on March 16, 2024, rendering Father's second appeal filed on April 5, 2024 untimely.

We commence by observing that the manner in which the Department obtained the jurisdictional findings and dispositional orders in this case is troubling at best. At the January 16 hearing, the Department's counsel encouraged the juvenile court to make findings and orders "as to Mother" based on her submission, and consented to set Father's challenges to jurisdiction and disposition at a separate future proceeding. The Department did not inform the court that, by making the findings as to Mother, it could result in Father's forfeiture of his right to a contested jurisdiction or disposition hearing. Indeed, when the juvenile court questioned whether it needed to take action regarding jurisdiction as a result of Father's challenge, the Department assured the court that it need do nothing further. In an apparent reversal, at the March 19 hearing, when submitting the issue of jurisdiction and disposition on the social worker's report, the Department argued that Father had waived his right to contest jurisdiction because jurisdiction had already been taken over the children based on Mother's submission at the January 16 hearing. The juvenile court agreed, declined to address Father's challenge to jurisdiction, and proceeded with the hearing only as to disposition. At the conclusion of the hearing, the juvenile court nonetheless found true all the jurisdictional allegations in the petition, including those related to Father, and issued a dispositional order. We now confront the results of the Department's advocacy for the entry of jurisdiction and disposition orders based on Mother's concession at the January 16 hearing, and the juvenile court's decision to adopt the Department's procedural approach to the adjudication of the dependency of these children.

Courts of Appeal have repeatedly disapproved conducting separate jurisdiction or disposition hearings for each parent, a procedure known as "splitting." The practice

13

undermines the integrity and fairness of dependency proceedings, especially when one parent contests the allegations and the other does not. (*In re Joshua G.* (2005) 129 Cal.App.4th 189 (*Joshua G.*); *In re A.J.* (2022) 77 Cal.App.5th 7 (*A.J.*).) Appellate courts have described the practice of "splitting" dependency hearings between parents as "unauthorized and erroneous[,]" and "improper." (*A.J.*, *supra*, at p. 14; *Joshua G.*, *supra*, at p. 202.) "[Jurisdictional and dispositional orders] are child-centric, not parent-centric, and cannot be 'split' as to each parent." (*A.J.*, at p. 14.) "This improper practice of 'splitting hearings' needs to be corrected by the juvenile court and [the Department] so such errors do not continue to cause confusion and delays, or require reversal, in the future." (*Id.* at p. 15.)

As the Court of Appeal for the Third District noted: "[T]here is only one simultaneous adjudication of jurisdiction and one simultaneous disposition." (*A.J.*, *supra*, 77 Cal.App.5th at p. 14, italics omitted.) In dependency proceedings, "[j]urisdiction is taken over the child, not over or 'as to' the parent(s)[,]" and, similarly, "disposition is made of the child." (*Ibid.*, italics omitted.) Accordingly, a jurisdictional finding against one parent will have the same effect on both parents. (*Ibid.*; *Joshua G.*, *supra*, 129 Cal.App.4th at p. 202 ["If the allegations against [mother] were true, it was irrelevant whether the allegations against [father] were also true."].) Additionally, dependency proceedings must adhere to strict timelines determined by, among other things, the dates of jurisdiction and disposition hearings. (See § 361.5, subd. (a)(1)(A) [duration of services based on the date of the *disposition hearing* and when the minor entered foster care]; § 361.49, subd. (a) [the date a child entered foster care is the earlier of the date of the *jurisdiction hearing* or 60 days after initial removal]; § 366.21, subd. (e)(1) [review hearing must be held within 6 months after the initial *disposition hearing* and not later than 12 months after the child entered foster care].) As the *A.J.* court observed, the practice of setting separate hearings for parents can wreak havoc with the

14

mandatory deadlines established in the dependency statutory scheme to the detriment of the child and parent. (*A.J.*, *supra*, at pp. 14-15.)

In *A.J.*, father was incarcerated in state prison during the COVID-19 pandemic and was not transported to the jurisdiction and disposition hearings, although the court issued orders to secure his attendance. (*A.J.*, *supra*, 77 Cal.App.5th at pp. 11-13.) After several continuances, the juvenile court made the jurisdictional findings and disposition orders as to mother and continued the jurisdiction and disposition hearing as to father. (*Id.* at p. 12.) Almost a year after the court had made the jurisdictional findings and six months after it had made the disposition orders as to mother, the court denied father's request for further continuances. (*Id.* at pp. 11-12.) The court proceeded with the jurisdiction and disposition hearing as to father in his absence, received evidence from his counsel, sustained the allegations as to father, and denied him reunification services. (*Id.* at pp. 13-14.) Father appealed, arguing that the court erred by proceeding to adjudicate the dependency despite his involuntary absence in violation of his right to be present at the proceedings under Penal Code section 2625. (*Id.* at p. 16.) Criticizing the practice of "splitting" hearings between parents, the appellate court concluded father's appeal was not timely because "[t]here is . . . only one jurisdiction hearing and one disposition hearing[,]" and the time for father to appeal ran from the earlier date of the disposition hearing "as to mother." (*Id.* at p. 16.) Further, the appellate court concluded that even if father's hearing was deemed an authorized disposition hearing, father failed to show prejudicial error when the hearing was held months beyond the permissible time for reunification with the child under section 352, subdivision (b), which mandates that the disposition hearing must be completed not more than six months after the detention hearing. (*Id.* at pp. 17-18.)

Relying on *A.J.*, the Department argues that Father's time to appeal the jurisdictional and dispositional orders ran from the earlier disposition hearing held on January 16, 2024, not the continued hearing held on March 19, 2024. We agree that the

juvenile court obtained jurisdiction over the children based on its findings and orders issued on January 16. " '[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent. [Citation.]' " (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 16.) Mother conceded that the juvenile court could take jurisdiction at the earlier hearing date, and her concession properly rendered the children dependents subject to the court's jurisdiction. But while the juvenile court obtained jurisdiction over the children based on its findings and orders issued on January 16, we conclude on the facts of this case, the time for Father to appeal the dispositional orders did not commence until March 19, when the court *completed* the disposition hearing, and issued orders which then became "final" for appeal purposes.[10]

In so doing, we distinguish *A.J.* from the case before us. In *A.J.*, the court continued the hearings "as to father" due to his absence from the proceedings because of his incarceration. The continuances spanned months and interfered with the mandates of the dependency statutory scheme. In the interim, mother and the child were engaged in reunification services. Here, all parties were present at the initial jurisdiction and disposition hearing and agreed to defer Father's challenges to a future date within two months of the initial hearing, with no violation of the timelines of the dependency statutes.

"A judgment in a proceeding under Section 300 may be appealed in the same manner as any *final* judgment . . . ." (§ 395, italics added; *Javier G.*, *supra*, 130 Cal.App.4th at p. 1999 [in dependency proceedings, the disposition order is the judgment].) "A judgment is the final determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577; see, e.g., *Sheila B.*, *supra*, 19

---

[10] As discussed above, jurisdictional findings are not directly appealable but may be subject to review upon a timely appeal of the court's disposition orders. Accordingly, our review focuses on the final disposition orders.

Cal.App.4th at p. 197 [when the order "is the end of the matter[,]" it is the final order for appeal purposes].) Here, the orders made at the January 16 hearing were not "final" for purposes of appeal because the court had not made a "final determination" but instead continued the issues related to Father to be determined at the next hearing. We agree that disposition is made of the child, not as to each parent. However, "[b]efore determining the appropriate disposition, the court shall receive . . . relevant and material evidence as may be offered . . . ." (§ 358, subd. (b)(1).) The court's dispositional orders made at the January 16 hearing could not have been final where the court specifically deferred consideration of Father's evidence until the next hearing date on the agreement of all parties, in effect continuing the issuance of a final dispositional order.

*A.J.* is also distinguishable because here the Department requested the court to split the jurisdiction and disposition hearings between the parents. But for the Department specifically asking the juvenile court to make orders as to Mother pending Father's contested hearing (and thereby inviting error as to how the proceedings were conducted), Father would not have been lulled into sitting on his appellate rights. During the January 16 hearing, the Department did not inform the juvenile court that the procedure it requested was unauthorized and improper, as the Department now asserts on appeal. To the contrary, when specifically asked by the juvenile court, the Department assured the court it did not need to take any action. Having invited this error, the Department cannot now take a contrary position.

For the reasons stated, we have jurisdiction because Father's second appeal (appeal No. H052054) is timely.

### 3. *Mootness*

The Department also argues that, because Father did not challenge the findings regarding Mother on appeal, "the findings and orders are as good as to father as they are

17

to the mother." We construe the Department's argument as a contention that Father's appeal is moot.

As our Supreme Court recently explained, "the principle that '[d]ependency jurisdiction attaches to a child, not to his or her parent' [citation], means that ' "[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate" ' [citation]." (*In re D.P.* (2023) 14 Cal.5th 266, 283-284 (*D.P.*).) "Thus, where jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot." (*Id.* at p. 283.) However, "when a parent has demonstrated a specific legal or practical consequence that will be averted upon reversal," such as if the jurisdictional findings were the basis for the dispositional orders challenged on appeal, "the case is not moot, and merits review is required." (*Ibid.*; *In re S.F.* (2023) 91 Cal.App.5th 696, 712 (*S.F.*) [father's appeal of the jurisdiction and disposition findings and orders was not moot, even though allegations against mother were not challenged on appeal].)

Here, the record shows that the court's jurisdictional findings related to Father served as the basis for the dispositional orders that are also challenged on appeal. As we explain below, the outcome of this appeal determines whether Father is designated an "offending" parent or a "nonoffending" parent. "Such a distinction may have far reaching implications with respect to future dependency proceedings in this case and father's parental rights[,]" justifying merit review on appeal. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763 (*Drake M.*), disapproved of by *D.P.*, *supra*, 14 Cal.5th at p. 283, and disapproved on other grounds by *In re N.R.* (2023) 15 Cal.5th 520 (*N.R.*).)[11] Accordingly, Father's appeal of the jurisdictional findings regarding his conduct is not

---

[11] The Supreme Court in *D.P.* disapproved of *Drake M.* to the extent it suggested a parent's challenge of jurisdictional findings that served as the basis for dispositional orders also challenged on appeal is only subject to discretionary appellate review. (*D.P.*, *supra*, 14 Cal.5th at p. 283.) In *N.R.*, the high court disapproved of *Drake M.*'s application and definition of "substance abuse" in dependency proceedings.

moot because the findings affected the juvenile court's dispositional orders, which are also challenged on appeal. We thus address his challenge to the jurisdictional findings even though dependency jurisdiction over the children will remain in place because the findings based on Mother's conduct are unchallenged.

### B. Denial of Father's Contested Jurisdiction Hearing

Father contends the juvenile court violated his rights under the First (free speech), Fourth (unreasonable search and seizure) and Fourteenth (due process) Amendments to the U.S. Constitution when the court denied him a contested jurisdiction hearing. The Department disagrees, noting that, throughout the proceedings, Father was represented by counsel, received notice of the hearings, and was present at each hearing.

We review constitutional due process claims de novo. (*In re J.R.* (2022) 82 Cal.App.5th 569, 587-588 (*J.R.*).)

"Parents have a fundamental liberty interest in the care, custody, and management of their children." (*David B. v. Superior Court* (2006) 140 Cal.App.4th 772, 777.) However, "[u]nlike a criminal defendant, a parent in a dependency proceeding does not have a right 'to full confrontation and cross examination' under the Sixth Amendment of the federal Constitution or article I, section 15 of the California Constitution. [Citations.] A parent does, however, have 'a due process right to a meaningful hearing with the opportunity to present evidence,' including a right to confrontation and cross-examination of witnesses. [Citations.]." (*In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1092; see also §§ 311, subd. (b), 355, subds. (b)(2) & (d); rule 5.534(g)(1).) For example, denials of contested review and disposition hearings have been considered to violate a parent's right to due process. (*In re James Q.* (2000) 81 Cal.App.4th 255, 268 [review hearing]; *In re Catherine H.* (2002) 102 Cal.App.4th 1284, 1292 [disposition hearing].)

Here, the juvenile court erred when it denied Father's due process right to a meaningful hearing to contest the allegations made against him at the jurisdictional stage. (See rule 5.684(a) ["If the parent . . . denies the allegations of the petition, the court must hold a contested hearing and determine whether the allegations in the petition are true"].) Throughout the proceedings, Father consistently denied the allegations of domestic violence, substance abuse, physical abuse, neglect, and, with respect to N.P., emotional abuse. Father requested, and was initially granted, a date for a contested hearing to challenge those allegations. However, on the day of the contested jurisdiction hearing, the court declined to proceed with the hearing because it had already made the findings "as to Mother" at the very hearing when Father requested that a contested hearing be set. The court then made findings that all the allegations in the petition, including those related to Father, were true without allowing Father an opportunity to present any evidence or argument. By doing so, the juvenile court violated Father's due process right to a meaningful hearing.

Such error is not reversible unless it is prejudicial. (See Cal. Const., art. VI, § 13; *J.R.*, *supra*, 82 Cal.App.5th at p. 531 ["We do not reverse dependency cases for harmless error"].) " 'When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. [Citation.]' [Citation.]" (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1073.) However, appellate courts do not agree on the standard of prejudice to be applied. "When we deal with error of federal constitutional dimension in dependency cases, it is unclear whether the prejudice test is that of harmlessness beyond a reasonable doubt [citations] or by clear and convincing proof [citations]." (*In re B.D.* (2019) 35 Cal.App.5th 803, 827; compare *In re Mark A.* (2007) 156 Cal.App.4th 1124, 1144 [beyond a reasonable doubt] with *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1515 [clear and convincing].)

20

We need not resolve that dispute here because, under either standard, the denial of Father's right to a contested hearing at the jurisdictional stage was not harmless. As outlined below, the evidence supporting the allegations of abuse and neglect as to Jk.P., Ja.P., and H.P. based on Father's conduct was lacking. The denial of Father's due process rights to challenge those allegations resulted in findings that Father was an offending parent and led to the court's entry of orders removing the children from his care. But for this error, there is a reasonable probability that the children, at least as to Jk.P., Ja.P., and H.P., would still be in his care. The error was not harmless beyond a reasonable doubt or by clear and convincing and evidence.

## C. *Sufficiency of the Evidence*

### 1. *Jurisdictional Findings*

For the court to find dependency jurisdiction over the children, the Department has the burden of proving by a preponderance of the evidence that the children are persons described by one or more of the section 300 subdivisions. (§ 355, subd. (a).) As we have discussed, the juvenile court properly took dependency jurisdiction over the children because Mother conceded jurisdiction based on the social worker's report. However, reviewing the record in the light most favorable to the juvenile court's determinations, we agree with Father that the findings with respect to him were not supported by the evidence.

" 'In reviewing the jurisdictional findings and disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citations.]" (*In re R.T.* (2017) 3 Cal.5th 622, 633.) Substantial evidence is not synonymous with any evidence, and while it may

consist of inferences, inferences based on speculation or conjecture are not evidence and cannot support a finding. (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.)

Here, at the January 16 and March 19 hearings, the Department submitted its report as evidence and called no witnesses. The juvenile court sustained all the allegations in the petition and found Jk.P., Ja.P., and H.P., suffered or were at substantial risk of suffering "serious physical harm inflicted nonaccidentally" by the parent (§ 300, subd. (a)), as well as "serious physical harm or illness" due to the parent's "failure or inability . . . to adequately supervise or protect the child" (§ 300, subd. (b)(1)(A)), and "inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subd. (b)(1)(D).) The allegations related to Father's conduct were based on N.P.'s statements regarding the conditions of the home, that Father smoked methamphetamine in the garage, as well as N.P.'s and Ja.P.'s statements that the parents argued frequently, and they disciplined the children with a hanger and belt.[12]

The evidence showed that the social worker who responded to the referral, interviewed the family, and inspected the home believed the allegations of physical abuse and neglect to be *inconclusive and lacking in evidence*. Although the social worker concluded the allegations of emotional abuse to be substantiated for N.P., Jk.P., and Ja.P. (and inconclusive as to H.P.), the petitions for Jk.P., Ja.P., and H.P. *did not allege* emotional abuse under section 300, subdivision (c), as a basis for jurisdiction, and "[w]e cannot affirm a jurisdictional finding that was never alleged or made in the trial court." (*In re V.M.* (2010) 191 Cal.App.4th 245, 253.) The basis for jurisdiction is problematic when the Department's representative asserted there was insufficient information to

---

[12] The dependency petitions in this case were in the form of a narrative, making it difficult to determine whether an allegation related to one or both parents and whether the allegation was intended to support the Department's allegations of physical abuse, neglect or emotional abuse. (See § 332, subd. (f) [pleading requirements]; *S.F., supra,* 91 Cal.App.5th at pp. 713-714 [legally sufficient pleadings in dependency proceedings are fundamental to due process].)

22

substantiate the allegations asserted in the petitions. The lack of evidence to support the court's findings becomes even more apparent when we review each allegation sustained against Father.

As to the section 300, subdivision (a), finding that the children suffered "serious physical harm inflicted nonaccidentally[,]" the single allegation specific to Father was N.P.'s statement that Father hit Jk.P. with a belt for exposing his private parts to his siblings. Father, Mother, and Jk.P. denied these allegations. Physical abuse under section 300, subdivision (a), expressly excludes "reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury." California law recognizes a parent's right to reasonably discipline his child and administer reasonable punishment. (*In re D.M.* (2015) 242 CA4th 634, 640 [that a parent implements punishment with a shoe instead of a hand is not, categorically, per se physical abuse].) There was no evidence as to which part of Jk.P.'s body Father hit or that the punishment caused serious physical harm, a required element of section 300, subdivision (a). There was no evidence whatsoever that any of the children, Jk.P., Ja.P., and H.P., had any physical injuries, let alone serious injuries. The Department's report showed that all three children had no visible injuries, marks or bruises. N.P. did not report such injuries or harm.

As to the section 300, subdivision (b), findings on neglect, the petition asserted various allegations related to Father ranging from substance abuse, domestic violence, and uninhabitable living conditions. None of these allegations were supported by the evidence.

There was no evidence, let alone any allegation, that Father excessively used drugs or alcohol, or that his alleged drug use rendered him unable to care for the children. (*N.R.*, *supra*, 15 Cal.5th at p. 555 [dependency jurisdiction based on "substance abuse" under section 300, subdivision (b)(1)(D), requires "excessive use of drugs or alcohol" that renders a parent unable to protect regular care].) When the Department inspected the

23

home, they found no evidence of drugs in the home, garage, or in Father's possession. Although N.P. reported seeing a bag with a powdery substance in the garage, there was no evidence that the bag contained drugs or that it was possessed or used by Father as opposed to Mother. There was no evidence or allegation that Father appeared under the influence of drugs or that he was unable to provide regular care for his children. Instead, the record contained evidence of Father's attention to his children during supervised visits, that Father cleaned the house, did the laundry, and sometimes cooked. Moreover, the record showed that Father completed a substance use disorder screening and the intake coordinator determined that no further assessment was necessary because Father was not at risk for relapse, and Father provided a negative drug test result. Although Father agreed at the initial detention hearing to drug testing, his failure to follow through is not, by itself, sufficient evidence to establish "substance abuse" where the Department failed to show such abuse in the first instance.

The allegations of domestic violence and uninhabitable living conditions are similarly lacking in support. Mother, Father, and Jk.P. denied any domestic violence. N.P. and Ja.P. stated that the parents argued frequently, used profanity, and Mother occasionally threw objects at or hit Father. There was no evidence that Ja.P. or any of his siblings had ever been physically harmed due to the parents' arguments. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717, disapproved on other grounds by *D.P.*, *supra*, 14 Cal.5th 266 [evidence of abuse related to domestic violence requires actual, or substantial risk of, physical harm].) As to the conditions of the home, when the Department inspected the home the day after it received the referral, there was no evidence that the house was littered with animal waste, infested with rodents, or was otherwise uninhabitable. Both Jk.P. and Ja.P. denied the presence of rodents in the home, and Ja.P. stated that, while their pets did sometimes urinate or defecate in the house, Father addressed the issue. The social worker indicated that the home had running water, food, electricity, and a bed for each child.

24

However, contrary to Father's assertion, our conclusion does not automatically mandate a reversal of all dispositional orders, even those binding on Father, because jurisdiction remains valid based on the unchallenged findings against Mother. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492, disapproved on other grounds by *D.P.*, *supra*, 14 Cal.5th at p. 283 ["A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established"].) Father is still required to show error on appeal as to the challenged disposition order.[13]

### 2. *Disposition Order Removing Children from Father's Care*

"To order a child removed from their parents' physical custody under section 361(c)(1), the juvenile court must find by clear and convincing evidence that (1) there 'would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being' of the child in the parents' home, and (2) 'there are no reasonable means by which the [child's] physical health can be protected without' removal." (*In re Zoe H.* (2024) 104 Cal.App.5th 58, 71, quoting § 361, subd. (c).) To determine "reasonable means," the juvenile court is required to consider both "[t]he option of removing an offending parent . . . from the home" and "[a]llowing a nonoffending parent . . . to retain physical custody as long as that parent . . . presents a plan acceptable to the court demonstrating that they will be able to protect the child from future harm." (§ 361, subd. (c)(1)(A)-(B).)

---

[13] Father challenges only the dispositional orders removing the children and ordering visitation. He does not raise arguments, or show error, as to the other dispositional orders such as participation in anger management classes, parenting classes, drug testing, etc. We do not address arguments not raised on appeal. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citation.]" (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

Our conclusion that there was insufficient evidence to support the jurisdictional allegations related to Father's conduct signifies that Father was a nonoffending custodial parent and, pursuant to section 361, subdivisions (c)(1)(A) and (B), the juvenile court must consider whether options exist for Father to retain custody of Jk.P., Ja.P., and H.P. The juvenile court, having erroneously treated Father as an offending parent, did not have an opportunity to consider whether Father could retain physical custody of the children, albeit under dependency jurisdiction.

However, even if we were to conclude that sufficient evidence supports the juvenile court's jurisdictional findings related to Father's conduct, that evidence does not meet the higher standard of clear and convincing evidence to support the court's dispositional orders removing Jk.P., Ja.P., and H.P. from Father's care.

" 'A child may not be taken from a parent's physical custody during juvenile dependency proceedings, except for a temporary detention period, unless clear and convincing evidence supports a ground for removal specified by the Legislature.' [Citation.]" (*In re M.V.* (2022) 78 Cal.App.5th 944, 958 (*M.V.*).) The grounds for removal are identified under section 361. "California dependency laws 'establish that out-of-home placement is not a proper means of hedging against the possibility of failed reunification efforts, or of securing parental cooperation with those efforts. It is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent. The law requires that a child remain in parental custody pending the resolution of dependency proceedings, despite the problems that led the court to take jurisdiction over the child, unless the court is clearly convinced that such a disposition would harm the child." (*Id.* at p. 959.)

Here, the court's findings of "substantial danger" (§ 361, subd. (c)(1)) and "severe emotional damage" (§ 361, subd. (c)(3)) for removal were based on the Department's conclusions that the parents denied the allegations, blamed N.P. for the proceedings, and because Jk.P., Ja.P., and H.P. exhibited aggressive, disruptive, and improper behaviors

after being removed from the parents.  As we discussed above, the evidence to support the allegations with respect to Father were lacking.  Father's denial of the allegations, and the Department's assertion that his denial demonstrated an absence of accountability, do not constitute "clear and convincing evidence" of danger.  "Although troubling, the parents' 'lack of transparency' or subsequent denial of the events that led to dependency is not sufficient, by itself, to justify removal of the [c]hildren from either parent's custody."  (*M.V.*, *supra*, 78 Cal.App.5th at p. 962.)  The record also does not demonstrate by clear and convincing evidence that the disruptive behaviors of Jk.P., Ja.P., and H.P. were the result of Father's conduct, and not attributable to removal from their home and separation from their siblings.  The evidence showed that, prior to removal, when the social worker saw Ja.P. and H.P., they appeared "happy" and Jk.P. repeatedly denied any issues at home.

Most importantly, we observe that the social worker who responded to the referral based on N.P.'s report, interviewed the family, and conducted the home inspection believed that the children "can safely remain in home with a safety plan."  Based on the record here, the Department did not provide clear and convincing evidence of a substantial danger and severe emotional damage to Jk.P., Ja.P., and H.P. to justify their removal from Father's care.

Accordingly, for the reasons stated, we reverse the dispositional orders removing the children from Father's care and remand the matter for the juvenile court to make appropriate determinations under section 361, subdivision (c).[14]

### III.    DISPOSITION

Appeal No. H051748 is dismissed as taken from a nonappealable order.

As to appeal No. H052054, the jurisdictional findings as to Jk.P., Ja.P., and H.P. related solely to Father's conduct are reversed.  The dispositional orders removing Jk.P.,

---

[14] Given our reversal of the order removing the children from Father's care, we need not address Father's arguments as to the visitation orders.

27

Ja.P., and H.P. from Father's care are reversed.  We remand the matter for the juvenile court to make appropriate dispositional orders under section 361, subdivision (c), as to Jk.P., Ja.P., and H.P.  The juvenile court shall set an initial hearing date on the matter within 15 days of the issuance of the remittitur and shall conduct the hearing on an expedited basis.  The juvenile court must make its decision based on the facts existing at the time of such further proceedings.

In all other respects, the jurisdictional findings and dispositional orders as to all four children, N.P., Jk.P., Ja.P., and H.P. are affirmed.

_____

Greenwood, P. J.

WE CONCUR:



_____

Grover, J.



_____

Danner, J.



In re B.P. et al.; Monterey County DSS v. J.P.
H051748/H052054